SALEM PACKING CO., A CALIFORNIA CORPORATION, PARENT, WINSTON FARMS, A CALIFORNIA CORPORATION, SUBSIDIARY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3956–68. Filed April 26, 1971.

*Henry Himmelfarb*, for the petitioners.
*Paul G. Wilson*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' consolidated corporate income taxes for the fiscal years ended May 28, 1965, and May 27, 1966, in the amounts of $142,727.89 and $18,681.80, respectively.

---

The issues for decision are:

(1) Was Winston Farms, without consent of the Commissioner, entitled to report its income for its fiscal years ended May 28, 1965, and May 27, 1966, on the cash basis of accounting while filing consolidated returns with its parent corporation, Salem Packing Co., which reported its income for these and prior years on an accrual basis?

(2) If respondent correctly determined that in order to file a consolidated return with Salem Packing Co., its parent, Winston Farms, must compute its income on an accrual method of accounting, should petitioners have an option to rescind their election to file a consolidated return and compute their taxes as if separate returns had been filed?

(3) If Winston Farms is entitled to file on the cash basis of accounting, is it entitled to deduct $34,802.53 paid as advances in its fiscal year 1965 to feedlots for feed and care of cattle in the following year?[1]

(4) Were the salaries paid by Salem Packing Co. to Philip E. Bauer and Phillip Himmelfarb excessive to the extent of $29,200 and $23,800, respectively, in each of the years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. Salem Packing Co. (hereinafter referred to as Salem), a California corporation formed on June 1, 1962, with its principal office and place of business at the time its petition in this case was filed in Los Angeles, Calif., filed its corporate income tax return for its fiscal year ended May 29, 1964, with the district director of internal revenue at Los Angeles, Calif.

Salem owned all of the stock of its affiliate Winston Farms (hereinafter referred to as Winston), which was incorporated under the laws of California on February 5, 1965. The principal office and place of business of Winston at the time the petition in this case was filed was Los Angeles, Calif. For each of the taxable years ended May 28, 1965, and May 27, 1966, Salem and Winston filed with the district director of internal revenue at Los Angeles, Calif., a consolidated corporation income tax return.

All of Salem's issued and outstanding stock during the years here in issue was owned by Philip E. Bauer (hereinafter referred to as Bauer). Salem was engaged in the business of processing beef carcasses into smaller cuts and boneless beef. Salem specializes in "block-ready"

---

[1] Respondent disallowed for similar reasons an amount of $10,000 for its fiscal year 1966 whether Winston Farms' income is reported on a cash or accrual basis, but petitioners raised no issue with respect to this disallowance.

operations whereby the whole carcass of beef is stripped of excess fat and cut into smaller sections so that the butcher at the store level needs only run that section through the band saw and wrap the cuts for market. Salem also fabricates beef into as many as 15 cuts ready for consumption, such as roasts, oven roasts, pot roasts, swiss steak, stew beef, ground beef, and rib steaks. Salem has Government contracts with the Department of Defense for meat for the Army in Vietnam, with the Veterans Administration, and with the Department of Agriculture for its various support programs such as the Needy Family Program and the School Lunch Program. Salem also sells to chainstores, but does not sell directly to restaurants.

The beef sold by Salem to various governmental agencies had to meet rigid inspection and be of a lean variety. In order to meet the specifications set by the Government contracts, specific kinds of cattle were required. Salem organized Winston to supply it with the kind of cattle required, and to protect it against a shortage of acceptable beef with which to meet its Government contracts. Winston is engaged in the business of purchasing cattle, having them fed by feedlots until they reach a certain level of weight, and then selling them to a slaughterer. Winston sold substantially all of its cattle to Federal Meat Co., a corporation which was wholly owned by Bauer. Federal Meat Co. (hereinafter referred to as Federal) is a slaughterer which primarily slaughters cattle on a daily basis for chainstore consumption. Salem purchased most of its beef from Federal during the years here in issue. The cattle sold by Winston to Federal comprised only a part of the beef carcasses sold by Federal to Salem. However, the carcasses from substantially all of the cattle sold by Winston to Federal were sold by Federal to Salem.

In the consolidated returns filed by Salem and Winston for the years in issue Salem reported its income on an accrual basis of accounting while Winston reported its income on the cash basis of accounting. Attached to the consolidated corporate income tax return for each of the years in issue was a Form 1122, "Return of Information and Authorization and Consent of Subsidiary Corporation Included in a U.S. Consolidated Income Tax Return," signed by Philip E. Bauer as president of Winston. Salem and Winston did not request permission of the Commissioner to report their consolidated income using different methods of accounting.

The following is a summary of the profit-and-loss statements of Salem for its fiscal year ended May 29, 1964, and for Salem and Winston for their fiscal years ended May 28, 1965, and May 27, 1966, as contained in their tax returns as filed:

| | FYE May 29, 1964 | FYE May 28, 1965 | | |
| --- | --- | --- | --- | --- |
| | Salem | Salem | Winston | Total |
| Income from sales | $4,461,162.37 | $5,817,919.83 | $219.71 | $5,818,139.54 |
| Cost of sales: | | | | |
| Beginning inventory | 1,341.58 | 3,968.31 | 0 | 3,968.31 |
| Purchases | 3,746,286.18 | 4,773,690.24 | 452,277.97 | 5,225,968.21 |
| | 3,747,627.76 | 4,777,658.55 | 452,277.97 | 5,229,936.52 |
| Less: Ending inventory | 3,968.31 | 4,123.60 | 452,029.51 | 456,153.11 |
| | 3,743,659.45 | 4,773,534.95 | 248.46 | 4,773,783.41 |
| Plant labor | 270,430.64 | 267,495.26 | 0 | 267,495.26 |
| Payroll taxes and insurance | 19,850.17 | 28,208.02 | 0 | 28,208.02 |
| Plant supplies and expense | 102,292.33 | 85,152.33 | 0 | 85,152.33 |
| Storage fees | 50,623.28 | 69,148.94 | 0 | 69,148.94 |
| Freight to destination | 40,895.84 | 22,219.84 | 0 | 22,219.84 |
| Total cost of sales | 4,227,751.71 | 5,245,759.34 | 248.46 | 5,246,007.80 |
| Gross profit (loss) | 233,410.66 | 572,160.49 | (28.75) | 572,131.74 |
| Less operating expenses: | | | | |
| Plant expense | 50,116.48 | 88,348.94 | 1 242,516.40 | 330,865.34 |
| Administrative expense | 91,839.21 | 168,366.59 | 0 | 168,366.59 |
| Total | 141,955.69 | 256,715.53 | 242,516.40 | 499,231.93 |
| | 91,454.97 | 315,444.96 | (242,545.15) | 72,899.81 |
| Add: Other income | 5,133.81 | 7,293.66 | 0 | 7,293.66 |
| Net profit (loss) | 96,588.78 | 322,738.62 | (242,545.15) | 80,193.47 |

| | FYE May 27, 1966 | | |
| --- | --- | --- | --- |
| | Salem | Winston | Total |
| Income from sales | $2,887,882.90 | $1,058,115.64 | $3,945,998.54 |
| Cost of sales: | | | |
| Beginning inventory | 4,123.60 | 452,029.51 | 456,153.11 |
| Purchases | 2,678,164.82 | 734,543.60 | 3,412,708.42 |
| | 2,682,288.42 | 1,186,573.11 | 3,868,861.53 |
| Less: Ending inventory | 186,185.28 | 615,898.96 | 802,084.24 |
| | 2,496,103.14 | 570,674.15 | 3,066,777.29 |
| Plant labor | 167,430.73 | 0 | 167,430.73 |
| Payroll taxes and insurance | 17,834.00 | 0 | 17,834.00 |
| Plant supplies and expense | 50,694.52 | 0 | 50,694.52 |
| Storage fees | 29,348.51 | 0 | 29,348.51 |
| Freight to destination | 49,254.47 | 0 | 49,254.47 |
| Total cost of sales | 2,810,665.37 | 570,674.15 | 3,381,339.52 |
| Gross profit (loss) | 77,217.53 | 487,441.49 | 564,659.02 |
| Less operating expenses: | | | |
| Plant expense | 45,469.30 | 1 360,349.81 | 405,819.11 |
| Administrative expense | 159,500.18 | 0 | 159,500.18 |
| Total | 204,969.48 | 360,349.81 | 565,319.29 |
| | (127,751.95) | 127,091.68 | (660.27) |
| Add: Other income | 3,434.52 | 0 | 3,434.52 |
| Net profit (loss) | (124,317.43) | 127,091.68 | 2,774.25 |

1 Schedule of expenses—Winston Farms

| Fiscal year ending May 28, 1965 | | Fiscal year ending May 27, 1966 | |
| --- | --- | --- | --- |
| Cattle feed | $237,191.79 | Cattle feed | $337,787.81 |
| Freight | 2,805.31 | Freight | 18.00 |
| Interest | 2,407.46 | Interest | 22,149.75 |
| Franchise tax | 100.00 | Franchise tax | 100.00 |
| Miscellaneous expense | 11.84 | Miscellaneous expense | 6.96 |
| | 242,516.40 | Professional services | 275.00 |
| | | Office expense | 12.29 |
| | | | 360,349.81 |

The $237,191.79 of payments made by Winston to feedlots in its fiscal year 1965 were made in May of 1965. As of the end of the fiscal year $34,802.53 of these payments had not been expended for feed and care charges by the feedlots to which the payments were made. In July 1965 Winston received a refund from the Colorado River Feedlot of $5,163.93 which was the unused portion of a payment made to it by Winston in May 1965 for feed and care of cattle. The bills which Winston received from Kern County Land Co. during is fiscal year 1965 exceeded the payments made by Winston to that feedlot during its fiscal year 1965 by $532.45.

The inventories of cattle as shown by Winston on the consolidated return reflect only the price paid by Winston for cattle. No portion of the feed costs was included either in cost of sales or "inventory" but these amounts were deducted from the gross profit on sales in arriving at the net profit or loss figures reported in the returns.

Winston generally fed cattle between 120 days and 160 days before the cattle reached the weight level which the officers of Winston considered the desirable weight for slaughter. For its short fiscal year beginning February 5, 1965, and ending May 28, 1965, Winston fed 3,382 head of cattle but only sold 2 head of cattle. For its fiscal year ended May 27, 1966, Winston fed 8,140 head of cattle and sold 4,118 head of cattle.

For its fiscal years ended May 28, 1965, and May 27, 1966, the gross poundage of meat purchased by Salem amounted to 13,215,227 pounds and 6,189,587 pounds, respectively. In its fiscal year ended April 30, 1965, and April 29, 1966, Federal's gross receipts were $17,984,299 and $17,400,531.67, respectively. From its incorporation to the end of its fiscal year 1966 Salem had distributed no dividends.

Bauer, in addition to being president of Salem and Winston during the taxable years in issue, was president of Federal and an officer of Dale's Transportation Co. He also conducted a cattle business as an individual with sales of approximately $250,000. Dale's Transportation Co.'s business consisted of leasing trucks, hauling livestock, and repairing refrigeration units and vans.

On Salem's income tax returns for the years in issue Bauer and his father-in-law, Phillip Himmelfarb (hereinafter referred to as Himmelfarb), were listed as devoting "part" of their time to Salem. On Federal's income tax returns for the fiscal years ended April 29, 1966, Bauer was listed as having devoted "all" of his time to Federal's business.

Prior to organizing Salem, Bauer had experience with two other meat packing companies, Mecca Meat Co. and the Acme Meat Co. In one of the companies he was the superintendent of all boning opera-

tions. In the other company which boned large amounts of cattle for the Government and others he directed all operations. There were approximately 25 people working under his direction for that company.

Bauer's duties for Salem included the buying of dressed beef and the selling of the processed beef. He generally ran the operations but conferred frequently with Himmelfarb and Salem's foreman on operational problems. He consulted Himmelfarb to determine market conditions for the purchasing of beef carcasses and future market prospects for animals which would meet the high standards and inspections required to satisfy Government contracts.

Himmelfarb's principal expertise was in the area of purchasing cattle and overseeing the feeding of them. Specific types of cattle were required for Salem's use. A careful watch had to be maintained to insure that the cattle would not become too fat and yield improperly. Himmelfarb traveled 3 to 4 days weekly examining the animals. He had to be able to make accurate estimates of the weight of the animal and to direct the feedlots as to proper diet for the animals. After the animals were slaughtered he would ascertain the yield of some of the animals from each particular feedlot. Himmelfarb purchased livestock for Winston and Federal as well as on behalf of his own personal business which sold between $2 and $3 million of livestock yearly.

In the fiscal year ended May 29, 1964, Bauer and Himmelfarb received from Salem salaries of $15,800 and $26,200, respectively. In the fiscal years 1965 and 1966 Bauer and Himmelfarb received $45,000 and $50,000, respectively, from Salem and $40,000 and $55,000, respectively from Federal.

Himmelfarb and Bauer each received salary as an officer of Dale's Transportation Co. of between $9,000 and $10,000 for each of the years 1965 and 1966.

Bauer and Himmelfarb were president and secretary, respectively, of Salem and of Winston. There was no other officer of Salem who was paid a salary. The foreman of the boning operation, who made $16,000 yearly, was Salem's highest paid nonofficer employee. Bauer sold meat for Federal and Federal also employed a nonstockholder salesman who was paid $30,000 yearly. Federal employed an assistant buyer who was paid $15,000 yearly.

There are a number of independent meat-packing companies in the Los Angeles area. Generally these companies are closely held and their executive officers are also their major stockholders. Generally, the operations of these other companies would be more nearly comparable to the combined operations of Winston, Federal, and Salem than to the operations of Salem only. These companies vary in size,

some being larger in volume of products produced and sold and some smaller than the combination of Winston, Federal, and Salem. The range of salaries paid to the executive officers of these companies for full-time services is from $45,000 to $100,000 yearly. The larger companies generally pay the higher salaries. Some of these companies have only one officer who receives a salary. The top range of yearly salary and bonus paid by any of these companies to a full-time chief meat salesman who owned no stock in the company was $70,000, and the top range of yearly salary and bonuses paid for full-time services to a chief buyer who owned no stock in the company was $65,000. Generally the chief meat salesman of a meat packing company is paid slightly more than the chief cattle buyer.

Respondent in his notice of deficiency increased the consolidated income of Salem and Winston as reported for their fiscal years 1965 and 1966 by $237,191.79 and $219,444.76, respectively, designated as an increase in ending inventory with the following explanation:

(b) It is determined that the taxable income of Winston Farms in the consolidated returns should be reported on the accrual method of accounting rather than on the cash receipts and disbursements method. This determination is based on the ground that Winston Farms may not use the cash receipts and disbursements method of accounting since that accounting method is different from the accrual method of accounting used by the other member of the consolidated group, Salem Packing Company, and the inconsistent methods of accounting do not clearly reflect consolidated taxable income. * * *

For the year ended May 28, 1965, there was a notation with respect to the $237,191.79 increase in inventory which stated:

*Included in the above amount is $34,802.53 which represents an advance deposit to feed lots for feed and care of cattle which was unexpended by the feed lots at the end of the current fiscal year. In the event it is held that Winston Farms is entitled to use the cash receipts and disbursements method of accounting, it is further determined that $34,802.53 is a deposit in advance for future expenses of feeding and caring for cattle and, as such, that amount is not deductible in the current year regardless of the method of accounting permitted.

For their fiscal year 1966 respondent made a counter adjustment to the consolidated income of petitioners to reduce income of Winston as reported by $237,191.79 of additional opening inventory with the same explanation as was given for the increases in income.

For each of the years respondent also increased petitioners' consolidated income as reported by disallowing $29,200 of the deduction claimed by Salem for salary paid to Bauer and $23,800 of the deduction claimed as salary paid to Himmelfarb, with the explanation that the deduction taken for salaries paid exceeded to this extent a reasonable allowance for compensation paid under section 162 of the Internal Revenue Code of 1954.[2]

---

[2] All references are to the Internal Revenue Code of 1954.

OPINION

Section 1501[3] allows an affiliated group of corporations the privilege of filing consolidated returns provided that all members of the affiliated group consent to all the consolidated returns regulations prescribed under section 1502.[4] The members can expressly consent by filing the proper form with the consolidated return. However, even though such a form has not been filed, the making of a consolidated return is considered to be such consent.

By signing and filing a Form 1122 Winston expressly consented to be bound by the consolidated return regulations.[5] On the consolidated returns Winston, which respondent recognizes to be a farmer, reported its income on the cash receipts and disbursements method of accounting, while Salem reported its income on an accrual method of accounting. Neither Salem nor Winston specifically requested consent from the Commissioner to file a consolidated return using different methods of accounting.

Respondent argues that for an affiliated group to be entitled to file consolidated returns using different methods of accounting, all four conditions set out in section 1.1502–44A of the regulations[6] must be satisfied. The respondent listed these four conditions as follows:

1. The members of the affiliated groups have established different methods of accounting;

2. The members of the affiliated group have obtained the consent of the Commissioner to retain their established methods of accounting;

3. The consolidated taxable income is clearly reflected; and

---

[3] SEC. 1501. PRIVILEGE TO FILE CONSOLIDATED RETURNS.

An affiliated group of corporations shall, subject to the provisions of this chapter, have the privilege of making a consolidated return with respect to the income tax imposed by chapter 1 for the taxable year in lieu of separate returns. The making of a consolidated return shall be upon the condition that all corporations which at any time during the taxable year have been members of the affiliated group consent to all the consolidated return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of such return. The making of a consolidated return shall be considered as such consent. In the case of a corporation which is a member of the affiliated group for a fractional part of the year, the consolidated return shall include the income of such corporation for such part of the year as it is a member of the affiliated group.

[4] SEC. 1502. REGULATIONS.

The Secretary or his delegate shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

[5] Form 1122 provides in part:

"The above-named subsidiary corporation, in consideration of the privilege of joining in making of a consolidated return with the above-named common parent corporation, hereby consents to and agrees to be bound by these provisions of the above-mentioned regulations."

[6] Sec. 1.1502–44A, Income Tax Regs., which is applicable for the years here in issue provides:

4. Intercompany transactions affecting such consolidated taxable income shall be eliminated and adjustments on account of such transactions made with reference to a uniform method of accounting to be elected by the members of the group with the consent of the Commissioner.

Respondent states that the fourth requirement listed above has no application to this case because Winston did not sell any of its cattle directly to Salem but instead sold its cattle to Federal with the result that there were no intercompany transactions. However, respondent contends that petitioners do not meet any of the other three requirements of the regulations. Respondent argues that the proper interpretation of the term "established" in the context of the entire consolidated return regulations is "fixed by custom or practice in the past" and that since its fiscal year 1965 was its first fiscal year, Winston had not "established" any method of accounting for its fiscal year 1965.

Respondent further contends that the provision that each member may retain its established method of accounting "with the consent of the Commissioner" places on the members of the consolidated group an affirmative requirement to specifically request that the Commissioner permit them to retain different established methods of accounting when filing a consolidated return. Finally, respondent states that the consolidated net income of Salem and Winston is not clearly reflected in the years here in issue with Winston using a cash basis of accounting and Salem an accrual method.

Petitioners take the position that Salem and Winston had established different methods of accounting for the years here in issue, that the regulations should not be interpreted as requiring a specific request by the members of the group to each retain its own established method of accounting but that the filing of a return using different

---

*Methods of accounting.—*

(a) *In general.* All members of the affiliated group shall adopt that method of accounting which clearly reflects the consolidated taxable income. A method of accounting which does not treat with reasonable consistency all items of gross income and deductions of the various members of the group shall not be regarded as clearly reflecting the consolidated taxable income. For example, one member of the group will not be permitted to report items of income or deductions on the cash method of accounting while another member of the same group reports the same or similar items on the accrual method. The provisions of this paragraph are subject to the exceptions stated in paragraph (b) of this section.

(b) *Combination of methods.* If the members of an affiliated group have established different methods of accounting, each member may retain such method with the consent of the Commissioner: *Provided,* That the consolidated taxable income is clearly reflected: *And provided further,* That intercompany transactions affecting such consolidated taxable income shall be eliminated and adjustments on account of such transactions shall be made with reference to a uniform method of accounting to be selected by the members of the group with the consent of the Commissioner.

(c) *Adjustments required by changes in method of accounting.* In any case in which a member of an affiliated group changes its method of accounting the provisions of section 481(a) shall be applicable.

methods should be considered sufficient, and that the consolidated income is clearly reflected.

Petitioners further take the position that if the regulations are interpreted to require a specific request by the members of the affiliated group to retain their established method of accounting, then the regulations should be considered invalid in this respect.

Petitioners argue that if they are correct in their interpretation that the filing of a consolidated return using different methods of accounting is sufficient, then the issue here is whether the Commissioner's change in the method used by Winston was reasonable. Petitioners contend that the Commissioner's recomputation of the consolidated net income in the notice of deficiency, computing Winston's income on an accrual basis, was not a reasonable action and should be held improper.

Petitioners finally contend that since Winston is a farmer and as such is entitled to select to use the cash method of accounting, it follows that this method does, as a matter of law, clearly reflect Winston's income.[7] Petitioners then state that it must therefore be concluded that the consolidated income of Salem and Winston is clearly reflected since Salem's income is clearly reflected on an accrual basis of accounting. Petitioners contend that to hold otherwise would be in effect to deprive Winston of a right which is given it by statute to report its income on a cash basis.

We have found no cases, nor has our attention been called to any case, interpreting the phrase in section 1.1502–44A of the consolidated return regulations, "established different methods of accounting." We have held that where a new entity succeeds to a business previously conducted by another, it selects its own accounting method in its first year of operation since the new entity has no preceding taxable year. *Exo Products Co.*, 37 T.C. 385 (1961); *Estate of John A. Biewer*, 41 T.C. 191 (1963), affd. 341 F. 2d 394 (C.A. 6, 1965); and *Silver Queen Motel*, 55 T.C. (1971).

---

[7] Petitioners point to sec. 1.162–12, Income Tax Regs., which provides in part as follows: A farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts actually expended in the carrying on of the business of farming. The cost of ordinary tools of short life or small cost, such as hand tools, including shovels, rakes, etc., may be deducted. *The purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay,* but not including the value of farm produce grown upon the farm or the labor of the taxpayer. [Emphasis supplied.]

Petitioners recognize that Winston must reduce purchases by the cost of cattle which remain unsold at the end of the year under the provisions of sec. 1.61–4, Income Tax Regs., which provides in part as follows:

(a) *Farmers using the cash method of accounting.* A farmer using the cash receipts and disbursements method of accounting shall include in his gross income for the taxable year—

\*      \*      \*      \*      \*      \*      \*

Based on these cases respondent's argument with respect to the proper interpretation of the word "established" has appeal. However, we need not decide this issue since in our view the fact that petitioners have not complied with the regulation requiring them to obtain the consent of respondent to their filing a consolidated return on different methods of accounting is under the facts here present sufficient to justify respondent in determining the subsidiary's income on the same method of accounting as that used by the parent.

In the case of *Regal, Inc.*, 53 T.C. 261 (1969), affirmed per curiam 435 F. 2d 922 (C.A. 2, 1970), we held respondent's regulation requiring an affiliated group of corporations which elected to make a consolidated return for any taxable year to make a consolidated return for each subsequent year during which the consolidation remained in existence unless certain conditions were met, to be valid. In so holding, we pointed out that the statute requires that all corporations consent to all of the consolidated return regulations in order to exercise the privilege of making a consolidated return. We further pointed out that section 1502 specifically provided for the Secretary or his delegate prescribing such regulations as may be deemed necessary in order that tax liability of any affiliated group of corporations making a consolidated return be computed in a manner to clearly reflect income. We called attention to the fact that under the provision "the consolidated return regulations, 'unlike ordinary Treasury Regulations, are legislative in character and have the force and effect of law.' *Union Electric Co. of Missouri* v. *United States*, 305 F. 2d 850, 854 (Ct. Cl.)."

For much the same reasons stated in *Regal, Inc.*, we conclude that the provision of sec. 1.1502–44A that members of an affiliated group,

---

(2) The profits from the sale of any livestock or other items which were purchased,
*　　*　　*　　*　　*　　*　　*

The profit from the sale of livestock or other items which were purchased is to be ascertained by deducting the cost from the sales price in the year in which the sale occurs, * * *

See *D. E. Alexander*, 22 T.C. 234 (1954), which upholds the provision of a comparable regulation under the 1939 Code and concludes that since farmers on a cash basis may deduct only the cost of livestock sold in a particular year, respondent was correct in requiring the taxpayer to compute his cost of sales by adding to amount of his purchases during the year, the cost of cattle held at the beginning of the year and subtracting therefrom the amount paid for the cattle remaining unsold at the end of the year even though the taxpayer was not required to use inventories in computing income.

The regulations (sec. 1.471–6) suggest certain methods under which a farmer using an accrual or inventory method of reporting income may value livestock. However, petitioners do not contend that if Winston is required to report its income on an accrual basis, the method used by respondent in the notice of deficiency for valuing Winston's livestock inventories is improper. Respondent in the deficiency notice computed the value of inventories of livestock by adding to the price paid for the livestock in inventory the cost which Winston had sustained in raising that livestock, consisting of the payments to the feedlot for feed and care of the livestock. Neither do petitioners question respondent's computation of the portion of Winston's payment to feedlots in the fiscal year ended May 27, 1966, which respondent determined to be applicable to the feed and care of the cattle unsold at the end of that year.

in order to use different methods of accounting in reporting consolidated income, must obtain the consent of the Commissioner, is a valid regulation. Since we view this regulation as valid, petitioners' failure to comply with this regulation causes them not to be entitled to report their income on a consolidated basis, using different methods of accounting. Even under petitioners' view this regulation would prohibit petitioners from reporting their income under different methods of accounting on a consolidated basis unless respondent was in error in refusing to consent to their so doing on the basis of the consolidated return they filed using different accounting methods.

On the basis of this record respondent's refusal to consent to petitioners' using separate methods of accounting was a reasonable action and in no way erroneous. The facts show that all of Winston's cattle ultimately were sold as meat products by Salem. Technically, there were no intercompany transactions between Winston and Salem. However, Winston sold its cattle to Federal, a corporation which was wholly owned by the same person who owned all the stock of Salem. The opportunity to manipulate the income of either Winston or Salem for any particular year through timing sales by Winston to or purchases by Salem from Federal is apparent if the two corporations use different methods of accounting. Because of using a cash method, Winston toward the end of the year could make sales to Federal and not report an amount as income until it had received payment in a subsequent year while Salem could include in its purchases items it had bought from Federal for which payments had not been made by it to Federal by the end of the year. In this way Winston's beef could be transferred to Salem with Winston reporting its income from the sale in a different year from that in which Salem included the purchase in its cost of goods sold or its closing inventory. While the record does not show whether or not this was in fact done, the Commissioner would certainly be justified in denying the right to the two companies to file consolidated returns on different methods of accounting under circumstances where such manipulation could be indulged in. Furthermore, in our view the record affirmatively establishes that under all the facts here present the consolidated income of Salem and Winston is not clearly reflected for their fiscal year ended May 28, 1965, with Salem using an accrual basis and Winston a cash basis. Therefore not only is the Commissioner's refusal to consent to petitioners' using separate bases of accounting justified, but petitioners have failed to meet a separate criterion of section 1.1502–44A of the regulations, namely, that the consolidated net income be clearly reflected.

In its fiscal year 1965 Winston reported a loss of $242,545.15 which of course was offset against Salem's profit of $322,738.62 to arrive

at consolidated net income. However, in its fiscal year ended May 28, 1965, Winston had only sold two head of cattle and its actual loss, if any, on the sale of these two head of cattle was certainly minor. Substantially the entire reported loss came from deducting as an expense the amount of $237,191.79 as the cost of feeding cattle. Winston had incurred most of this expense during the taxable year to fatten its cattle and thereby increase their weight and value. Therefore, on any reasonable basis of valuing Winston's inventory of cattle, the $237,191.79 feeding costs will be reflected in the value of its inventory of cattle on hand at the end of the year. At the end of its fiscal year 1965 Winston was holding cattle with an actual value approximating $690,000 which cattle were to be transferred through Federal to Salem for ultimate sale. Since these cattle had not been sold, Winston had sustained no profit or loss from its operation. However, because of electing as a farmer not to report income on an inventory basis, Winston showed a substantial loss. Therefore, the record affirmatively shows that the consolidated income for petitioners' fiscal year ended May 28, 1965, is not clearly reflected. Petitioners do not specifically argue that the consolidated net income is clearly reflected but rather argue that since Winston as a farmer is entitled to report its income on a cash basis, the consolidated income must be as a matter of law considered to be clearly reflected or otherwise Winston is deprived of a privilege granted it by law.

Petitioners in making this argument overlook the fact that they were not required to file a consolidated return but elected the privilege of so doing. Had petitioners filed separate returns, Winston in its first year would have been entitled to select any method of accounting which it was permitted to select by the Revenue Code and as a farmer might have been permitted to select the cash basis whether or not that basis clearly reflected its income for that particular year as distinguished from over a number of years. However, having elected the privilege of filing a consolidated return with its parent, Salem, it is bound under the consolidated return regulations to either adopt the same method of accounting as that used by Salem or obtain the consent of the Commissioner to use a different method of accounting. For different methods to be properly used by members of a consolidated group, the consolidated income must be clearly reflected.

As the court stated in *United States* v. *Transamerica Corporation*, 345 F. 2d 765, 79 (C.A. 9, 1965), the filing of a consolidated return was a privilege and "the privilege was conditioned upon all members of the affiliated group consenting to the consolidated return regulations, [footnote omitted] including the regulation requiring the use of a consistent system of accounting by all affiliates." The same is true in

this case, and as the court pointed out with respect to the taxpayer in the *Transamerica* case, there was no compulsion on Winston to use an accrual method of accounting since it did not need to exercise the privilege of filing a consolidated return with Salem. If it chose to file such a consolidated return, the fact that a condition was attached to the exercise of that privilege could not be interpreted as depriving Winston of a right to file on any basis a farmer is permitted to use. We sustain respondent's determination that Winston's income must be computed on an accrual basis in arriving at the consolidated income of Winston and Salem.

At the trial petitioners' counsel stated that if Winston must report its income on an accrual method of accounting in a consolidated return with Salem, then these corporations should be permitted to rescind their election to file a consolidated return and file separate returns for the years in issue. On brief petitioners made no argument on the merits of this stated alternative position. In any event we consider it to be without merit. Section 1501 allows an affiliated group of corporations the privilege to elect to file their returns and to have their tax liability computed on the basis of a consolidated return. Having elected at the time of the filing of the return to exercise the privilege, separate returns cannot thereafter be made for that year. Sec. 1.1502–10A (a).[8] Petitioners agreed to abide by these regulations at the time of filing their consolidated return. We have held that a mistake as to the consequences of the election does not lessen the binding character of that election. *Landy Towel & Linen Service, Inc.*, 38 T.C. 296, 301–302 (1962), affirmed per curiam 317 F. 2d 362 (C.A. 3, 1963).

Since we have sustained the respondent's computation of Winston's income for its fiscal year 1965 on an accrual basis, the respondent's alternative position as to the advance payment to the feedlots becomes moot.

The final issue concerns the reasonableness of the salaries paid by Salem to Bauer and Himmelfarb for the years here in issue. Section 162 provides for a deduction by a taxpayer of a reasonable allowance for salaries or other compensation paid for services actually rendered.

---

[8] Sec. 1.1502–10A Exercise of privilege.—

(a) *When privilege must be exercised.* The privilege of making a consolidated return under section 1502 for any taxable year of an affiliated group must be exercised at the time of making the return of the common parent corporation for such year. For this purpose, the return is considered as made on the due date of such return (including any extensions of time granted by the Commissioner), regardless of the actual previous date of filing. Under no circumstances can such privilege be exercised at any time thereafter. The filing of separate returns for a taxable year does not constitute an election binding upon the corporation in subsequent years. If the privilege is exercised at the time of making the return, separate returns cannot thereafter be made for such year. (See, however, § 1.1502–18A, relating to failure to comply with the regulations under section 1502.)

What is reasonable compensation to be paid to an officer is a question of fact to be determined by the circumstances in each case. The cases involving reasonable compensation are numerous and they list many criteria for making the determination. Among the factors to be considered are the amounts ordinarily paid for similar services by similar businesses; the expertise of the employee; the amount of the employee's time devoted to the employer's business; previous salaries received by the employee; the volume of the employer's business and the amount of its earnings; and where the employer is a closely held corporation purportedly paying salary to stockholder officers whether the corporation regularly pays dividends.

The record in this case indicates that Bauer devoted his time to selling the products of both Salem and Federal. The record indicates that very little of Himmelfarb's time was devoted to the activities of Salem but that his time was largely devoted to purchasing cattle for Winston and Federal. In this case, however, we are determining only the reasonableness of salaries paid by Salem to Bauer and Himmelfarb for services rendered to Salem. The services they rendered to Winston or Federal as well as to Dale's Transportation Co. and their individual businesses are of importance only in determining the amount of their time devoted to Salem's operations and the nature of the services they rendered to Salem. When a consolidated income tax return is filed, the separate identity of the affiliated taxpayers is preserved and all computations except those specifically allowed to be computed on a different method are made in the same manner and under the same conditions as if separate returns were to be filed. See sec. 1.1502–31A(b)(2), Income Tax Regs.[9]

In our view the record shows that irrespective of Himmelfarb's expertise as a cattle buyer, he rendered only minor services to Salem. His services were rendered primarily to Winston, Federal, Dale's Transportation Co., his own extensive cattle business, and apparently also to Bauer's individual business. Since Salem is not entitled to deduct payments as salary to Himmelfarb except to the extent those payments are reasonable for the services Himmelfarb rendered to Salem, we sustain respondent's disallowance of $23,800 of the deduction claimed by Salem as salary paid to Himmelfarb. Petitioners have

---

[9] Sec. 1.1502–31A(b)(2) *Other computations on separate basis.* The various other computations required by the regulations under section 1502 to be made by the several affiliated corporations shall be made in the case of each such corporation in the same manner and under the same conditions as if a separate return were to be filed, but with the following exceptions:

failed to show that $26,200 did not represent reasonable compensation to Himmelfarb in each of the years here in issue for services actually rendered to Salem.

The record discloses very different facts with respect to Bauer's services to Salem. Bauer was not only president but also the chief salesman for Salem. If Salem had any other salesman he was paid less than $16,000 a year since the record shows that in the years here in issue the highest paid employee of Salem other than its officers was the foreman of the boning department who was paid $16,000. While the record is clear that Bauer did not devote his full time to Salem's operations, he did act as its chief meat salesman as well as supervising the boning operation and being its president. He also, of course, acted as chief meat salesman for Federal and the record is far from clear as to what portion of his time was devoted to each of these corporations. However, the record does show that Federal employed a nonstockholder meat salesman in the years here in issue to whom it paid $30,000 a year.

Respondent argues that nothing in this record indicates that Bauer should be paid more in 1965 and 1966 than in 1964 when he received a salary from Salem of only $15,800.

We disagree with respondent. The record shows a substantial increase in the sales, gross profits, and net profits of Salem in its fiscal year 1965 as compared to its fiscal year 1964. There was a decline in Salem's sales and profits in its fiscal year 1966 as compared to both 1964 and 1965. However, this decline does not necessarily mean that Bauer's salary should also decline. From the facts in this record, Salem might well have been entitled to deduct an amount in excess of $15,800 as reasonable salary to Bauer in its fiscal year 1964 had it paid him in excess of that amount.

Considering all the facts in this record bearing on Bauer's expertise in the meat-packing business and his services to Salem as well as those facts shown by the record as to amounts paid by other corporations engaged in the meat packing business in the Los Angeles area to officers and employees, we have concluded that $35,000 is a reasonable salary for Salem to pay to Bauer in each of the years here in issue for services rendered by Bauer to that corporation. We therefore sustain respondent's disallowance of the deduction claimed by Salem for salary paid to Bauer in each of the years here in issue only to the extent of $10,000.

*Decision will be entered under Rule 50.*