PLASTICS UNIVERSAL CORPORATION, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Plastics Universal Corp. v. Commissioner
Docket Nos. 1566-78, 1567-78, 1568-78.
United States Tax Court
T.C. Memo 1979-355; 1979 Tax Ct. Memo LEXIS 172; 39 T.C.M. (CCH) 32; T.C.M. (RIA) 79355; September 5, 1979, Filed *172 Held, amount of reasonable compensation paid to L. Rogers Wells, Jr. by Plastics Universal Corporation and Southern Explosives Corporation determined. Bruce M. Reynolds and J. Bissell Roberts, for the petitioners. Robert Touchton, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' income tax as follows: Docket
Deficiency in
Petitioner
Number
Year
Income Taxes
Plastics Universal
1566-78
Taxable Year
$ 2,588.15
Corporation
Ending 9/30/74
L. Rogers Wells,
1567-78
1974
4,852.69
Jr., and Judy
1975
12,271.27
R. Wells
Southern Explo-
1568-78
Taxable Year
sives Corpora-
Ending 3/31/75
42,496.02
tion
*173 Due to concessions the only issues presented for our consideration in these consolidated cases are: (1) whether, in docket 1566-78, bonus compensation paid to petitioner, L. Rogers Wells, Jr., and to Delma Siddens in the amount of $43,043 by petitioner, Plastics Universal Corporation, in its fiscal year ending September 30, 1974 constituted reasonable compensation within the meaning of section 162; [2] and (2) whether, in docket 1568-78, bonus compensation paid to petitioner, L. Rogers Wells, Jr., in the amount of $158,016 by petitioner, Southern Explosives Corporation, in its fiscal year ending March 31, 1975, constituted reasonable compensation within the meaning of section 162. [3]
*174 FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner, Plastics Universal Corporation (hereafter Plastics) is a corporation organized on October 15, 1973 under the laws of Kentucky. At all times here relevant and at the time it filed its petition herein, its principal office was in Glasgow, Kentucky. Plastics was organized originally to manufacture bathtubs and shower stalls. During the fiscal year in question, however, Plastics was engaged in the business of strip mining coal in Knox County, Kentucky. Plastics filed its Federal corporate income tax return for the year ending September 30, 1974 at the Internal Revenue Service Center in Memphis, Tennessee. Petitioners, L. Rogers Wells, Jr. and Judy R. Wells, husband and wife, filed joint Federal income tax returns for the taxable years 1974 and 1975 at the Internal Revenue Service Center in Memphis, Tennessee. On the date they filed their petition, they resided in Glasgow, Kentucky. Judy R. Wells is included in the present action only because she signed the joint tax returns; therefore, all *175 references hereafter to Wells are solely to L. Rogers Wells, Jr. Petitioner, Southern Explosives Corporation (hereafter Southern) is a corporation organized on March 24, 1967 under the laws of Kentucky. At all times here relevant and at the time it filed its petition herein, its principal office was in Glasgow, Kentucky. Southern was engaged, during the year in question, in the business of manufacturing explosives at its principal place of business in Glasgow, Kentucky. Southern filed its Federal corporate income tax return for the fiscal year ending March 31, 1975 at the Internal Revenue Service Center in Memphis, Tennessee. During the years in question, Wells was president or chief executive officer of Glasgow Fertilizer Company, Industrial Warehousing Company, Smiths Grove Fertilizer Company, Scottsville Fertilizer Company and American Materials, Inc. (hereinafter sometimes referred to as the "other" companies or corporations), as well as president of Plastics and Southern. He was also the sole, majority or fifty percent stockholder in all of these companies. In each company, however, Wells hired one individual to be responsible for the actual day-to-day operations of *176 the company. Wells' function generally was that of a trouble-shooter, working on major problems that might arise in the operations of each company. Wells' normal workday in Glasgow began at 6:00 a.m. at a breakfast meeting in a local restaurant. He would meet with officers of several of the companies to discuss problems that the companies might have been experiencing. Wells' workday usually would continue until about 7:00 p.m. for five days per week. He also worked one-half day on Saturdays and would be on call for 24 hours per day for problems that might occur. During the years in question, Wells' duties with regard to Glasgow Fertilizer Company (hereafter sometimes Glasgow) included procuring raw materials for the fertilizer production by means of telephone conversations with approximately twenty suppliers. These calls averaged approximately fifteen minutes in duration. He also established through discussions with heads of local banks and credit associations the policies to be followed by Glasgow in extending credit to individual farmers. Wells performed these duties from his office in Glasgow, and visited the fertilizer plant only for brief but periodic inspection tours. *177 On rare occasion Wells met with suppliers away from Glasgow. Wells' compensation from Glasgow consisted of a $20,000 annual salary, plus a bonus equal to 10 percent of the net profits. Wells' involvement in Scottsville Fertilizer Company and in Smith's Grove Fertilizer Company was fairly minimal. His duties included procuring raw materials for the plants, which task he achieved at the same time as he contacted the suppliers of Glasgow Fertilizer Company. Wells' compensation from each company consisted of 10 percent of the net profits. The sole function of American Materials, Inc., (hereafter American) during the years in question was to lease equipment to Plastics in an arm's-length transaction. Wells' duties here involved setting policy and conferring with the vice-president and manager of operations of American in making decisions regarding the type of equipment to be purchased. Wells' salary from American was $20,000 plus a ten percent bonus. During these years, Wells had almost no duties in regard to Industrial Warehousing Company. The company leased space in its one warehouse in Glasgow. Wells' duty consisted of renting space in the warehouse when the leases expired. *178 With all of these other companies, Wells, for the most part, fulfilled his responsibilities from his office in Glasgow, Kentucky. During the years 1974 and 1975, none of these companies experienced severe operations problems that required an inordinate amount of Wells' attention. Although the oil embargo did tighten the supplies of raw materials for the fertilizer plants, it does not appear that this situation materially affected Wells' working schedule. The combined effect of all these duties, however, did represent a commitment of a substantial portion of Wells' working day. Wells spent approximately 20 percent of his time on his responsibilities to these other corporations. None of these corporations ever paid a dividend. Plastics
Plastics was incorporated in 1973 for the purpose of manufacturing bathtubs and similar products. The original shareholders and directors of Plastics were Wells and his father, L. Rogers Wells, Sr. Due to certain problems with the company manager, however, Plastics' business was unsuccessful. In January 1974, Wells met with Delma Siddens (hereafter Siddens) in regard to establishing a coal mining company. As a result of the meeting, *179 Wells and Siddens agreed to enter the coal mining business. Wells chose Plastics, whose business was defunct, as the corporate entity with which to enter the business. L. Rogers Wells, Sr. was not interested in entering this enterprise so he sold his stock in Plastics to Wells for $1,000. At a later meeting on February 11, 1974, between Wells, Siddens, Larry Thornton, a director of Plastics, and Terry Forcht, an attorney in Corbin, Kentucky, Wells agreed to transfer 50 shares of stock, or one-third ownership in Plastics to Siddens in exchange for mining and tipple [4] leases held by Siddens. Wells and Siddens also agreed that Siddens would become vice-president of Plastics. At this meeting, the parties discussed the proper compensation to be paid to Siddens. Siddens stated that he had been offered $105,000 to manage another company. Wells asked Forcht what a proper salary would be. Forcht indicated that he was an attorney for several similar coal companies, and he felt that a range of salary between $50,000 and $75,000 would be appropriate for the first year. The attorney indicated that such high salaries were appropriate because coal mining was a cyclical business where *180 money may be made in one year and lost in the next year. Siddens indicated that he needed at least $67,000 to meet financial commitments. The parties agreed that Wells, as president and chief executive officer of Plastics, would receive a $60,000 salary, and Siddens, as vice-president, would receive a $67,000 salary. Wells stated that in all the organizations in which he was involved there existed a bonus arrangement which also would be applied to Plastics. Wells would get ten percent of the net profits. Siddens, responsible for acquiring mining leases, would get five percent. Ralph Depp, as superintendent of the actual production, also would get five percent. At this meeting Forcht suggested, and Wells and Siddens agreed, that should their compensation be found to be excessive each would repay the excessive portion to Plastics. During this initial period, Plastics had many problems to which Wells had to attend. After the organizational meeting, Wells went to Barbourville, Kentucky, over 100 miles away from Glasgow, to view the leased property acquired from Siddens. While there he attended *181 a magistrates' meeting for the purpose of creating good will among the local people. At the meeting, however, Wells experienced a hostile attitude toward the commencement of mining in the Stinking Creek area. The population was upset because the company that had previously mined the lease had destroyed the roads and a bridge. Wells later resolved the problem by agreeing to construct a new bridge and to pay a tonnage fee for repair of the roads. Plastics experienced other start-up problems, including a labor dispute with independent truckers and bad weather.In addition, the commencement of mining operations was made more difficult by the fact that Plastics was mining at three different locations, and the tipples were located approximately 20 to 35 miles from the mine sites. In order to meet these problems and to make the business operable, Wells spent 5 days per week at the mine site for approximately 1 or 2 months, and then 3 days per week there for the next 4 months until August or September 1974. Wells' normal workday during fiscal year 1974 in Barbourville commenced with a breakfast meeting at about 6:00 a.m. and ended at about 8:00 or 9:00 p.m., after the second mining *182 shift commenced. Wells rented an apartment in Barbourville, but, on the occasions when Wells had to commute to Barbourville from Glasgow, he would get up at 3:00 a.m. Wells was responsible for the overall managing, planning and control of Plastics, involved in all the day-to-day operations. His specific activities included the following: (1) checking coal quality; (2) checking coal loading; (3) checking equipment; (4) checking explosives techniques; (5) checking truck assignments; (6) checking tipples; (7) conferring with coal brokers; (8) reviewing prospecting; (9) working with government agencies; (10) maintaining public relations; (11) negotiating with labor; (12) planning for the future; (13) arranging financing; and (14) supervising coal removal. Wells dealt with approximately 50 individuals connected with the Plastics operations, 15 of which were actual employees. Wells' experience in the explosives industry and in dealing with construction equipment helped him in the coal mining business. Even after August or September 1974, Wells was involved in routine day-to-day operations of the company. He was not required to be at the mine sites as much, but he still kept a close *183 watch over the operation to ensure that all Federal, state and local regulations were being followed, and that the mining operation was being done properly. Wells also had a radio system set up on Pine Mountain near Barbourville so that he could be contacted at the mining site. Wells spent approximately 40 percent of his time working on Plastics' operations during fiscal 1974. Siddens had exceptional knowledge in regard to coal leasing in Knox County, Kentucky. Over the years, Siddens acquired a substantial number of maps, geological maps and leases.He also had acquired considerable knowledge of the people inhabitating Knox County. Siddens had been involved in some facet of the coal business since prior to 1940. In 1972, he had leased 5,000 acres of land in Knox County. Upon the initial start-up of business, Siddens provided business advice to Wells. Thereafter, however, he was primarily involved in the abstracting of titles and acquisition of leases. It was important that properly located leases be acquired to prevent the needless moving of expensive and heavy machinery. Leasing of coal included the following activities: (1) contacting potential lessors, (2) prospecting, *184 (3) geological map study, (4) map study, (5) deed study, and (6) lease negotiation. From February 11, 1974 to June 8, 1974, Siddens leased an additional 4,047 acres of land, involving more than 30 leases. This increased the leased acreage from 5,000 to 9,047. From June to the end of August 1974, Siddens, with the help of an aide, leased an additional 4,000 acres of land. From February 1974 through September 1974, Siddens worked over 2,000 hours on the acquiring and abstracting of leases. Plastics sold its coal through brokers, mostly through Randall Fuel of Atlanta, Georgia. The demand for coal was high during fiscal year 1974. The oil embargo increased coal usage and prompted utilities to stockpile coal to avoid shortages. After fiscal 1974, however, when the demand for Plastics' coal dropped in March 1975, Plastics began to show a loss. At that time, Plastics had leases on approximately 13,000 acres. The decision was made to sell the company rather than to improve its competitiveness by investing three to five million dollars in a unit train tipple. It took approximately one year for Wells to sell Plastics to ADA Resources of Houston, Texas. All of the stock in Plastics *185 was sold to ADA Resources for $2,500,000. The total selling price of Wells' 2/3 share as listed on Wells' 1976 Federal income tax return, however, was only $941,437.35. Wells and Siddens did not receive any compensation from Plastics after fiscal 1974. Plastics paid no dividends in fiscal 1974 or 1975. Although a decision had been made in fiscal 1974 not to proceed at that time, Plastics was retaining its earnings for possible future construction in the form of a unit train tipple. Plastics mined approximately 12,000 to 15,000 tons of coal per month. Its gross income for the year ending September 30, 1974 was $2,315,277. Net income before officer compensation was $266,120. Officer compensation for the year in question was as follows: Officer
Salary
Bonus
Total
Wells
$60,000
$28,695
$88,695
Siddens
67,000
14,348
81,348
Respondent determined that the bonus compensation paid to Wells and Siddens during Plastics' fiscal year ending September 30, 1974 was excessive. Thus, the bonus amounts of $28,695 and $14,348 were considered unreasonable compensation to Wells and Siddens, respectively, and, therefore, a total of $43,043 was disallowed as a *186 deduction.
Southern
Southern was incorporated in 1967 for the purpose of purchasing, selling, and dealing in chemicals and chemical compounds including explosives. Wells conceived the idea in order to serve the local construction industry in building interstate highways in Kentucky. The original shareholders and directors of Southern were Wells, his father, L. Rogers Wells, Sr., and his brother, R. Gilbert Wells. Each shareholder owned one-third of the outstanding stock. L. Rogers Wells, Sr., was the original president of Southern; R. Gilbert Wells was the vice-president, and Wells was the secretary-treasurer. R. Gilbert Wells was in charge of the operations of Southern, and became president of Southern on March 28, 1969. Wells participated in acquiring land for the corporation, constructing the plant, and locating railroad facilities. After the initial acquisition of land and construction, however, Wells had little involvement in the operation of the business until he became president of the corporation on October 16, 1970. On October 16, 1970, R. Gilbert Wells resigned as president and director of Southern and sold his stock in Southern to Wells for approximately $5,000, *187 the book value of the stock. At that time Wells became president of Southern. L. Rogers Wells, Sr. made a gift to Wells of the remaining one-third of the stock on May 31, 1971. At the time of the gift the book value of the Southern stock was $8,355.69. In the year in question, Southern was involved in manufacturing, marketing, packaging, transporting and distributing three explosive products: Sk-117 (Sexco Booster), Superprime and Nitro-carbo-nitrate. At various times during its years of operation, Southern also researched and developed new products, instructed customers in seminars on the proper uses of the explosives and constructed new plants and facilities. Sales of the explosives had been achieved through the efforts of occasional advertising and varying numbers of salesmen. When Wells became president in 1970, the primary customers of Southern were highway contractors and quarry operators. Approximately two years before the fiscal year in question, however, Southern began changing its emphasis to selling to the coal industry. During its 1975 fiscal year, Southern sold its explosives primarily to the coal industry. Southern's facilities in Glasgow were more than 70 *188 miles from the bulk of its mining customers. Southern's business has been regulated by the following Federal and state agencies: (1) Bureau of Alcohol, Tobacco and Firearms; (2) Interstate Commerce Commission; (3) Department of Transportation; (4) Bureau of Mines; and, (5) Kentucky MESA, involved in mine safety. From the time Wells became president of Southern in 1970, his duties included the following: (1) purchasing raw materials; (2) planning advertising; (3) approving customer credit; (4) hiring employees; (5) planning marketing; (6) supervising salesmen; (7) dealing with government agencies; (8) arranging Southern's financing; (9) limited entertaining of customers; (10) developing new products; (11) instructing customers in the uses of explosives; and, (12) designing and constructing plant and equipment. During this time, Wells dealt with the problems of any of the other companies of which he was chief executive officer. His time was not restricted to working on the problems of Southern. Wells' duties involving Southern were eased, moreover, once subordinate employees acquired experience and undertook additional responsibilities. Southern hired Eddie Cook as head of *189 production and shipment. Southern also had a plant foreman, Billy Anderson. By the start of Southern's fiscal year 1975, these employees eased considerably the amount of attention Wells had to devote to the affairs of Southern. By fiscal 1975, Wells' activities for Southern centered primarily on the acquisition of raw materials. Wells usually accomplished this task by telephone conversations from his office in Glasgow, approximately one mile from the Southern plant.In November 1973, Wells arranged a contract with Trojan Powder Company to purchase 10,000 tons a year of low density ammonium nitrate to be used in the manufacture of nitro-carbo-nitrate. As a result, Southern terminated its contract for such materials with United States Steel. On January 1, 1974, Trojan Powder Company began to ship ammonium nitrate in accordance with the new contract. In mid-February 1974, however, Trojan Powder Company stopped shipping to Southern because of the Arab oil embargo. As a result of the embargo, the supply of natural gas became tight, and ammonium nitrate, a by-product of natural gas, also came in short supply. Trojan Powder Company proposed to allocate its supply of ammonium nitrate *190 among its customers based on prior consumption. Because Southern had received only 1,200 tons of ammonium nitrate from Trojan in the past, its proposed allocation for the remainder of 1974 was 1,200 tons. Southern would not have been able to pay its expenses manufacturing such a small amount of Nitro-carbo-nitrate. Wells arranged a meeting in New York to discuss the allocation problem with Bill Leonhardt, the president of Commercial Solvent Corporation, parent of Trojan Powder Company. Wells met with Leonhardt and called him periodically for the next two weeks. Leonhardt, however, finally indicated that Southern would receive only its proposed allocation. Wells also tried to obtain ammonium nitrate from United States Steel Corporation, its previous supplier, but with no success. Wells then began contacting fertilizer suppliers, railroad companies, insurance companies and farm cooperatives in an effort to obtain ammonium nitrate.Within one week, Wells was successful in obtaining 12,000 tons of the raw material located in Sterlington, Louisiana. He exchanged this supply with United States Steel for the same of amount of material. The general shortage of ammonium nitrate *191 and consequent reduction in the supply of explosives, however, increased the demand for Southern's products. In order to meet the increased demand, Southern increased production. Wells had sole responsibility to ensure the supply of raw materials in this increased production. His requests for raw materials were made primarily through telephone conversations. Wells, however, also attended chemical and fertilizer meetings and visited manufacturing facilities on 6 to 8 occasions during fiscal 1975 in an effort to obtain the raw materials. Wells contacted between 50 and 100 people in order to obtain ammonium nitrate during that year; before the embargo he would contact only 3 people. Wells used contacts he had acquired in both the fertilizer and explosives industries, and was successful in obtaining adequate ammonium nitrate supplies from approximately 20 sources. The ammonium nitrate that Wells was successful in acquiring, however, was of a high density, which had been used for agricultural purposes rather than in explosives manufacturing.Wells then developed Superprime, an explosive made from high density ammonium nitrate. The development of Superprime was achieved after limited *192 experimentation and testing. During this time, Southern began selling its products to customers of other explosives companies which could not provide their customers with an adequate supply of explosives. Makeshift pilot plans were fabricated in order to begin production of Superprime and another new product, SK-117. Development of SK-117 was begun in 1971 and 1972. The development was finished in fiscal 1975. Southern was manufacturing and shipping as fast as the explosives could be produced. Southern's sales increased as follows: INCOME INFORMATION
Net Income Before
Year
Gross Sales
Wells Compensation
Wells Compensation
March 31, 1968 * $ 156,930 $ 3,138 $ 0
March 31, 1969 * $ 554,265 $ 36,955 $ 0
March 31, 1970 $ 513,300 $ (11,159) $ 2,000
March 31, 1971 ** $ 583,541 3,323 $ 0
March 31, 1972
$1,062,137 $ 93,475
$ 18,617
March 31, 1973
$1,200,402 $ 13,111
$ 10,354 [5]
March 31, 1974
$2,423,272 $ 235,266
$ 39,820
March 31, 1975
$7,636,194
$1,518,360
$178,015
March 31, 1976
$5,171,084 $ 699,576
$ 94,067
March 31, 1977
$6,361,059 $ 694,604
$ 94,227
March 31, 1978
$7,220,239 $ 696,720
$ 99,999 5a
*193 Year
Taxable Income
Federal Taxes
March 31, 1968 * $ 3,138 $ 0
March 31, 1969 * $ 36,955
$ 12,221
March 31, 1970 $ (13,159) $ 0
March 31, 1971 ** $ 3,323 $ 942
March 31, 1972 $ 74,858
$ 28,205
March 31, 1973 $ 3,911 $ 0
March 31, 1974 $ 195,446
$ 83,171
March 31, 1975
$1,340,345
$625,711
March 31, 1976 $ 605,509
$244,016
March 31, 1977 $ 600,377
$253,900
March 31, 1978 $ 596,721
$178,390
*194 The inventory and accounts receivable for Southern for fiscal years 1968 through 1978 were as follows: SCHEDULE OF INVENTORY & ACCOUNTS RECEIVABLE INCREASES AND DECREASES 3-31-68 through 3-31-78 Increases
Increase
Inventory
during year
Acc. Rec.
during year
Balance 3-31-68
$35,933
$35,933
$42,851
$ 42,851
69
61,564
25,631
73,114
30,263
70
20,747
(40,817)
71,219
(1,895)
71
15,353
(5,394)
106,236
35,017
72
56,318
15,353
131,170
24,934
73
100,238
43,920
173,800
42,630
74
152,525 [6]
52,287
382,932
209,132
75
1,142,532
990,007
306,655
(76,277)
76
143,257
(999,275)
716,565
409,910
77
775,027
631,770
1,311,741
595,176
78
886,815
111,788
1,152,818
(158,923)
*195 Wells' duties in fiscal 1975 were limited primarily to securing raw materials and work on new products development. Although Wells was responsible for the hiring of all supervisory personnel involved in the company, none were hired during fiscal 1975. During that year, Southern did not do as much advertising as it had in earlier years. Wells' customer relations activities were primarily concerned with providing the product on time to the customer. Wells' supervision of salesmen during the year in question involved informing the one salesman of what types of people he wanted him to call on, and of what the credit arrangements would be. Customer credit problems were resolved by relaying information to the bank, which would check out the customer and render its opinion to Wells. Wells made the ultimate decision as to whether to extend credit to the customer. Southern sold explosives to between 30 and 50 customers in fiscal 1975. A sales force was not necessary during this year because the demand was so great that potential customers called Southern and requested the product. The time Wells spent in dealing with government regulators was minimal during the year in question. *196 His activities in regard to constructing new facilities were of a supervisory nature. During 1975, it included the conversion of an old building to be capable of producing SK-117. The conversion took approximately one month, but Wells was not present to direct the day-to-day activities. Overall, Wells devoted approximately 40 percent of his time to the business of Southern, and, as in his other organizations, Wells fulfilled his duties primarily from his office in Glasgow. During the year in issue, Wells received as compensation a total of $178,015 consisting of a $20,000 annual salary, plus a ten percent bonus. [7] Eddie Cook, head of production received a $12,000 annual salary plus a five percent bonus. Billy Anderson, plant foreman, received approximately an $8,000 annual salary and no percentage bonus. Southern had paid its chief executive officer a ten percent bonus from its beginning of operations. Southern had consistently paid such bonuses even though it had to borrow money to pay the bonuses in certain years. The history of bonus payment is as follows: *197 COMPENSATION
L. Rogers Wells, Sr.
Wells
Year
Salary
Bonus
Salary
Bonus
March 31, 1971 $ 0 $ 0 $ 0 $ 0
March 31, 1972
$10,000 $ 0
$10,000 $ 8,617
March 31, 1973 $ 0 $ 0
$ 7,154 $ 3,200
March 31, 1974 $ 0 $ 0
$14,000
$ 25,820
March 31, 1975 $ 0 $ 0
$20,000
$158,016
March 31, 1976 $ 0 $ 0
$20,000
$ 74,067
March 31, 1977 $ 0 $ 0
$20,000
$ 74,727
R. Gilbert Wells
Eddie Cook
Year
Salary
Bonus
Salary
Bonus
March 31, 1971
$7,902 *
$ 3,808 $ 0
March 31, 1972 $ 0 $ 0
$ 8,000
$ 2,500
March 31, 1973 $ 0 $ 0
$10,192
$ 2,500
March 31, 1974 $ 0 $ 0
$12,230
$13,910
March 31, 1975 $ 0 $ 0
$12,000
$83,166
March 31, 1976 $ 0 $ 0
$12,000
$40,929
March 31, 1977 $ 0 $ 0
$30,000
$14,088 [8]
*198 Respondent determined that the compensation paid to Wells was excessive in the amount of Wells' bonus, $74,849.67. OPINION The questions presented are whether the compensation paid to petitioner Wells by Southern in the fiscal year ending March 31, 1975 and to Wells and Siddens by Plastics in fiscal year ending September 30, 1974 constituted reasonable compensation for services rendered. Section 162(a)(1) of the Internal Revenue Code of 1954 provides that there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered. Section 1.162-7(a), Income Tax Regulations provides that "the test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services." The regulations further provide, as to bonuses, that: * * * Generally speaking, if contingent compensation is paid pursuant *199 to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. 1.162-7(b)(2) However, "[in] any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances." 1.162-7(b)(3). Thus, to be deductible, the compensation must be intended solely as compensation for services. Section 1.162-7, Income Tax Regs.; Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1340 (1971), affd. without opinion 496 F.2d 876 (5th Cir. 1974); Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362 (9th Cir. 1974), affirming a Memorandum Opinion of this Court; Klamath Medical Service Bureau v. Commissioner, 29 T.C. 339, 347 (1957), *200 affd. 261 F.2d 842 (9th Cir. 1958), cert. denied 359 U.S. 966 (1959). This issue is a question of fact to be decided in light of all the circumstances. Electric & Neon, Inc. v. Commissioner, supra; Paula Construction Co. v. Commissioner, 58 T.C. 1055, 1059 (1972), affd. without opinion 474 F.2d 1345 (5th Cir. 1973). In instances where the employee is also a majority shareholder and director of a close corporation, the compensation paid is subject to particularly close scrutiny in order to ensure that the payments are not, in fact, distributions of corporate profits. Miles-Conley Co. v. Commissioner, 173 F.2d 958, 960 (4th Cir. 1949), affg. 10 T.C. 754 (1948). To be deductible, the compensation also must not exceed the fair value of the services rendered. Electric & Neon, Inc. v. Commissioner, supra, Nor-Cal Adjusters v. Commissioner, supra, Klamath Medical Service Bureau v. Commissioner,supra. This issue is also a question of fact. Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 151 (8th Cir. 1974), *201 affg. a Memorandum Opinion of this Court, cert. denied 420 U.S. 908 (1975); Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 605 (9th Cir. 1968), affg. a Memorandum Opinion of this Court; Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 711 (1977); Pepsi-Cola Bottling Co. of Salina v. Commissioner,61 T.C. 564, 567 (1974), affd. 528 F.2d 176 (10th Cir. 1975). The burden of proving the reasonableness of the compensation is on the petitioner. Botany Worsted Mills v. United States,278 U.S. 282 (1929); Pepsi-Cola Bottling Co. of Salina v. Commissioner,supra;Levenson & Klein, Inc. v. Commissioner,supra.
The factors relevant to this consideration have been detailed in Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court. They include: the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; *202 a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. In this analysis, no single factor is decisive; rather, we must weigh the totality of all the facts. Mayson Mfg. Co. v. Commissioner, supra.
We will now examine the compensation paid by Southern and Plastics in light of the framework established by the regulations and cases cited above. Plastics
Plastics and respondent cite various factors to support their respective contentions, but we see no reason to discuss at length each factor raised by the parties. Rather, we will limit our discussion to those considerations we deem significant here. Both parties agree that Plastics benefitted from favorable economic conditions in fiscal 1974. The Arab embargo made the sales of coal easier for *203 Plastics and, thus, reduced somewhat the problems that Wells otherwise would have faced in establishing a coal operation. The parties also agree, however, that Wells spent a considerable amount of time in Barbourville working on the mine operation. It is also agreed that Siddens was very knowledgeable with regard to coal mining leases in Knox County. These two factors tend to show that the value of the services rendered by Wells and Siddens was considerable. We find that although, as respondent notes, Wells did not have any technical knowledge of coal mining itself, Wells did bring considerable experience to his position as president of Plastics. Wells had experience with heavy machinery and explosives which was useful in the Plastics operations. Wells used this knowledge in the blasting and shipping of coal. More importantly, however, Wells had valuable experience in management. As is obvious from the success of Plastics and his other organizations, Wells possessed an ability to effectively organize, to delegate responsibility and to meet special problems that might arise. While the solutions to the initial problems of Plastics may not be considered especially "innovative, *204 " they do demonstrate an ability to meet substantial problems, and to ensure the smooth-running of a business operation. Wells' responsibilities in Plastics were considerable. He was in charge of the overall management of the company, involved in all facets of the operation. Although, as in the other corporations, there was an operations manager, it does not appear that, in this new business beginning operations the manager wielded as much of the day-to-day responsibilities as did the other operations managers. In beginning the mining, Wells had added responsibilities. He had to coordinate all the various functions in order to create a smooth-running, efficient operation. At the same time, he had to deal with 50 individuals connected with the mining operation, and had labor difficulties with some of these individuals. Wells' duties, therefore, required thought, and effective management ability. It is also clear that Wells devoted a considerable amount of time to the running of Plastics in fiscal 1974. He worked at the minesite in Barbourville for extended periods of time during that year, and had to undertake the added expense of renting an apartment in Barbourville to be *205 near the site. Wells spent approximately 40 percent of his time working on Plastics' operations. Respondent states that the part-time nature of the employment should be a significant factor in deciding the proper level of compensation. It is not, however, a determinative factor. This Court has stated that it will look to the value of the services rendered and to the quality of the experience of the employee, rather than to the actual amount of time spent by the employee on the job. Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 713 (1977). In addition, it must be remembered that Wells devoted 40 percent of a 12 to 13 hour normal workday with 1/2 day on Saturdays working on the affairs of Plastics. Thus, it appears that the amount of time spent by Wells in working for Plastics was not inconsiderable. It took, in fact, a great deal of his efforts and energies. For his efforts in Plastics, Wells received a $60,000 salary plus a bonus of $28,695 determined by taking 10 percent of the net profits. Although Plastics' attorney, Forcht, stated that the salary was *206 in the range offered by other companies, no direct evidence was offered by either party as to whether this payment was comparable to that offered by comparable enterprises. In addition, there are no prior years of compensation from Plastics with which to compare Wells' fiscal 1974 compensation. There are, however, other factors which are relevant. Wells' 10 percent bonus arrangement was identical to that received from his other organizations. Although the salary level was substantially higher in Plastics than in the other corporations, this level of compensation was justified by the cyclical nature of the coal industry. This position is evidenced by the substantial decline in Plastics' sales after March 1975. It should also be noted that not only Wells, but the other officers in Plastics, Siddens and Ralph Depp, received bonus payments. These payments were similar to the percentages received by the operations managers in some of the other organizations. It does not appear, therefore, that the bonus percentages were set by reference to the percentage of stock ownership. The fact that no dividend was paid in fiscal 1974, Plastics first year of operations, also is not significant *207 here. Plastics stated that it was retaining its earnings for the possible building of a unit train tipple. Although, as respondent notes, Plastics had decided in 1974 not to go ahead with construction of the tipple facility, it is not unusual for a corporation to retain earnings for such possible future construction or expansion. The repayment of excessive compensation agreement contained in the corporate minutes also is not determinative. Although it does evidence an awareness on the part of Plastics' attorney that the compensation may be found to be excessive, it does not necessarily indicate that Wells or Siddens thought the compensation was in fact unreasonable. It is entirely possible that the inclusion of the repayment agreement was not reflective of any suspicions on the part of Wells or Siddens but, rather was, as petitioner notes, the result of good business caution in which "a professional advisor would be derelict in not suggesting such language." Wells and Forcht testified that the repayment agreement was suggested by the attorney, Forcht, and that it was agreed to by Wells and Siddens as a sound precaution. We find the testimony to be credible, and, based on this *208 testimony, we think that in this instance the repayment agreement does not demonstrate a suspicion on the part of Wells or Siddens that the compensation was unreasonable. We do not doubt, however, that under other circumstances a repayment clause may be suggestive of such a suspicion. Charles Schneider & Co., Inc. v. Commissioner,500 F.2d 148 (8th Cir. 1974). [9] In any event, we think that even if the existence of the repayment agreement were found to be a factor indicating a suspicion by Wells and Siddens that their compensation was unreasonable, this factor would not affect the result in this case. We find, on balancing the factors, that the payments made to Wells in fiscal year 1974 do not constitute unreasonable compensation within the meaning of section 162 of the Internal Revenue Code. The compensation received by Siddens is subject to the test by the same factors. Siddens was eminently qualified by his experience in coal mining in the Knox County area. His knowledge was a valuable asset to Plastics. Siddens' duties were also very important *209 for the success of Plastics. It was crucial that Plastics has leased areas in which to mine the coal, and it was important that these leases be in close proximity to one another to avoid the costly moving of heavy machinery. Siddens worked long hours on this job. Although Plastics was in operation for only 7 months during fiscal 1974, Siddens worked 2,000 hours in researching and negotiating mining leases. His efforts resulted in a substantial increase in Plastics' leased acreage. The acreage more than doubled during this period. It is clear that his efforts were of substantial importance to the success of Plastics. Accordingly, we find that the bonus compensation paid to Siddens was reasonable. Southern
Again, respondent and Southern cite various factors to support their contentions regarding the bonus compensation paid to Wells during fiscal year 1975. We find that, as petitioner contends, Wells was eminently qualified for his position as chief executive officer of Southern. Wells had valuable experience and contacts that proved to be important in 1975 when Southern's supply of raw materials was severely limited by Trojan Powder Company's inability to meet its *210 contract commitments. Wells used his contacts and abilities, and was able, in an apparently short period of time, to restore the usual supply of ammonium nitrate. With periodic, relatively brief phone conversations, he was able to increase supply to meet the growing demand. Wells also used his experience with explosives to develop from the high density materials he was able to purchase an explosive that could be marketed successfully to coal miners and highway contractors. Wells did have to devote more time to his obligations to Southern during the year in issue than he did prior thereto. He had the added responsibility in this year of purchasing more ammonium nitrate in a shortage market under difficult circumstances. We do not feel that these increased responsibilities were effectively offset by a decrease in other duties.It appears that by fiscal 1975 Wells' routine duties were already substantially limited to acquiring raw materials. Any increase in this responsibility would increase the level of his overall duties. These factors tend to show that Wells deserved more compensation for his efforts in fiscal 1975.
On balance of the factors, however, we find that the level *211 of bonus compensation actually paid to Wells was excessive. Although Wells earned an increase in the level of compensation he received in the year in question, it does not appear that his efforts merited the 347 percent increase that he received. Wells' main duties were effectively limited to acquiring raw materials. During the year in question he had an able head of production who managed production and shipment. Wells had no sales problems in the high demand market of that year, and devoted virtually no time or thought to customer relations or government regulations. The development of Superprime, and finishing the development of Sexco Booster do not appear to have involved an inordinate amount of effort. In addition, Wells' supervisory function in the construction of new pilot plans consumed little attention. Other than the raw materials shortage, therefore, there were no special problems that year to consume Wells' time or energies.
The raw materials problem was resolved by periodic phone conversations made from Wells' office in Glasgow. Although Wells made six to eight trips to conventions that year in order to meet or maintain contacts and made a trip to New York City *212 to meet with Bill Leonhardt, these efforts, along with the increased number of phone calls made, do not appear to have involved a sufficient increase in the level of activity to justify the enormous jump in compensation. Any argument to this effect would seem, in fact, to be almost inconsistent with the testimony regarding the extensive duties Wells owed to Plastics and his other organizations. The substantial increase in salary, as respondent notes, reflects more Southern's ability to pay rather than the value of Wells' increased services. Although Wells was a very qualified executive, and was successful in gradually increasing Southern's profits, the leap in sales during fiscal 1975 was due more to the economic conditions than to Wells' abilities. Since the amount of bonus was geared largely to profits, the increase in Wells' compensation during that year reflected in some substantial measure the fortuities of the economic conditions. See Huckins Tool & Die, Inc. v. Commissioner,T.C. Memo. 1959-190, affd. 289 F.2d 549 (7th Cir. 1961); Burford-Toothaker Tractor Co. v. Commissioner, a Memorandum Opinion of this Court dated March 13, 1950, affd. 192 F.2d 633 (5th Cir. 1951), *213 cert. den. 343 U.S. 941 (1952); Wood Roadmixer Co. v. Commissioner,8 T.C. 247 (1947). This observation is buttressed by the fact that in the years after fiscal 1975, the level of profits dropped to a more stable level. Respondent allowed an increase of more than $63,000 over the $39,819.86 Wells received in fiscal 1974 from Southern. This increase in bonus reasonably compensates Wells for his services. Accordingly, taking into account all the factors mentioned above, we find that petitioner has not met his burden of proof in challenging respondent's determination of a deficiency and that Wells' reasonable compensation from Southern for the taxable year ending March 31, 1975 was $103,166.35 ($20,000 salary plus a bonus of $83,166.35). Decision will be entered under Rule 155 in docket No. 1566-78. Decision will be entered under Rule 155 in docket No. 1567-78. Decision will be entered for respondent in docket No. 1568-78. Footnotes
1. Cases of the following petitioners are consolidated herewith: L. Rogers Wells Jr. and Judy R. Wells, docket No. 1567-78; and Southern Explosives Corporation, docket No. 1568-78.↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect during the taxable years in issue.↩
3. Resolution of the issue in docket 1567-78 depends entirely upon our findings in the preceding issues. Petitioners, L. Rogers Wells, Jr. and Judy R. Wells included as earned income in the maximum tax computations on their returns for taxable years 1974 and 1975 all compensation received from Plastics Universal Corporation and Southern Explosives Corporation. Respondent determined that such compensation was unreasonable, and constituted dividend income; such income would not qualify for the maximum tax on earned income treatment. Accordingly, to the extent an adjustment is made on the foregoing issues, an adjustment must be made to the Wellses individually.↩
4. A tipple is an apparatus by which loaded cars are emptied of their coal.↩
*. Wells was not actively involved in the management of Southern. ** The first year that Wells served as president of Southern. ↩
5. Petitioner's exhibit 22 states that Wells' compensation for Southern's fiscal year 1973 was $9,200. Petitioner does not state the basis for this calculation. The payroll records, however, indicate that this figure is in error, and that Wells' compensation from Southern for this year was $10,354. Apparently, petitioner failed to include Wells' compensation from Southern in the amount of $1,153.85 for the period 8/31/72 to 9/29/72. We note that petitioner's income tax return for fiscal 1973 shows total compensation for Wells of $9,200, consistent with petitioner's claim here. In any event, we do not believe this discrepancy affects the outcome of this case. ↩
5a. On brief respondent notes that Wells' compensation for Southern's fiscal year 1978 as listed on petitioner's exhibit 22 reflects only the salary paid to Wells.The $99,999 shown does not include any amounts paid to Wells that year under the 10 percent bonus arrangement. This discrepancy is irrelevant to the outcome of this case.↩
*. Wells was not actively involved in the management of Southern. ** The first year that Wells served as president of Southern.↩
6. Petitioner's exhibit 25 states that the balance of Southern's inventory on 3/31/74 was $173,800, resulting in an increase in inventory for fiscal 1974 of $73,562, and that the increase in inventory for fiscal 1975 was $968,732. Petitioners' tax return for 1974 indicates that these figures are in error. We do not believe, however, that this discrepancy affects the outcome of this case.↩
7. Southern showed net income of $1,518,360 during its fiscal year ending March 31, 1975. Ten percent of this amount is only $151,836; adding this to Wells' salary of $20,000 does not total the $178,015 he was paid. Neither party addressed this discrepancy.↩
8. Petitioner's exhibit 23 states that Wells' salary for fiscal 1973 was $6,000, resulting in a total compensation for that year of $9,200, and that Eddie Cook's salary and bonus for petitioner's fiscal year 1977 were $12,000 and $32,088, respectively. Petitioner's exhibit does not state the basis for these calculations. Petitioner's payroll records indicate that these figures are in error. We do not believe, however, that this error affects the outcome of this case.↩
9. See also Castle Ford, Inc. v. Commissioner,T.C. Memo. 1978-157↩.