PEPSI-COLA BOTTLING COMPANY OF SALINA, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6362–72. Filed January 29, 1974.

*Thomas J. Kennedy*, for the petitioner.
*Joe K. Gordon*, for the respondent.

FORRESTER, *Judge:* Respondent has determined deficiencies in the income taxes of the petitioner for the calendar years 1968, 1969, and 1970 in the respective amounts of $35,158.05, $47,859.44, and $50,783.89. The sole issue now remaining for our decision is whether the salary paid by petitioner to its president and sole stockholder, Verla Nesbitt Joscelyn, was excessive to the extent that it exceeded $40,000 for each of the years in issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner's registered and principal office has at all times been located in Salina, Kans., and was so located at the time the petition was filed. Its corporate income tax returns for the years in issue were filed with the district director of internal revenue at Austin, Tex.

Verla Nesbitt Joscelyn (Verla) and her then husband, R. W. Nesbitt, moved to Salina, Kans., and started a Pepsi-Cola bottling business in about 1941. An explosion occurred in the bottling plant in 1945 which killed R. W. Nesbitt and Verla continued operating the business as sole proprietor until July 1, 1955, at which time she caused the business to be incorporated as Pepsi-Cola Bottling Co. of Salina, Inc. (petitioner), under the laws of the State of Kansas. Petitioner has been engaged continuously since that time in such business which involved the manufacture, packaging, and distribution of Pepsi-Cola, 7-Up, Dr. Pepper, and other soft drink beverages within franchised

territories in north-central Kansas, which territories were and are geographically exclusive in nature.

Verla has served as president and general manager of petitioner since its incorporation and has at all times held 248 of its outstanding 250 shares of stock.

Less than a year after its incorporation and on February 14, 1956, petitioner's directors adopted the following resolution which has remained continuously in effect since that time and which sets forth the compensation arrangement for Verla as follows:

BE IT RESOLVED, That the compensation of Verla Nesbitt, for her services as Manager of the business of this corporation, be and the same is hereby fixed at an annual salary of $6,000.00 per year, and an annual bonus based on the net income of this corporation for its respective calendar year after deduction of all expenses other than Federal and State corporate income taxes, in an amount to be determined by totaling the sums resulting from application of percentages to brackets of such net income, as follows: 10% of the first $10,000.00; 20% of the next $10,000.00; and 30% of all such net income in excess of the first $20,000.00.

Verla has been compensated in accordance with this resolution since its adoption and the following table shows petitioner's net sales, taxable income, stockholder's equity, and Verla's compensation (salary plus bonus) for the years 1956 through 1970:

| Year | Net sales [1] | Taxable income | Stockholder's equity | Verla's compensation (salary plus bonus) |
|---|---|---|---|---|
| 1956 | $662,358 | $40,961 | $65,687 | $19,490 |
| 1957 | 669,012 | 34,909 | 88,410 | 16,977 |
| 1958 | 805,228 | 51,571 | 119,493 | 24,334 |
| 1959 | 925,305 | 62,454 | 157,279 | 29,102 |
| 1960 | 953,413 | 55,238 | 189,770 | 25,928 |
| 1961 | 1,041,904 | 81,583 | 235,387 | 37,422 |
| 1962 | 1,165,382 | 71,636 | 275,817 | 33,098 |
| 1963 | 1,198,923 | 86,764 | 322,877 | 39,417 |
| 1964 | 1,216,888 | 67,979 | 374,388 | 31,013 |
| 1965 | 1,490,934 | 78,334 | 423,307 | 36,700 |
| 1966 | 1,646,954 | 104,672 | 485,794 | 48,203 |
| 1967 | 1,752,738 | 90,547 | 542,684 | 41,753 |
| 1968 | 1,972,727 | 149,418 | 622,508 | 67,187 |
| 1969 | 2,208,932 | 196,542 | 728,841 | 88,457 |
| 1970 | 2,379,935 | 215,706 | 845,541 | 97,552 |

[1] Petitioner deducted no returns or allowances from its gross sales and consequently its gross and net sales were identical.

During the years in issue Verla was 63, 64, and 65 years old, respectively, was in good health and continued to be active in petitioner's business. She was petitioner's only active executive officer for all of the years since its inception, had no other business activities and worked 50 to 70 hours a week, 6 days a week and on Sundays, if necessary, in petitioner's behalf.

During the years in issue petitioner employed a total of 56, 60, and 64 persons, respectively.

Pepsi-Cola Co. (the national company) considers that one of the best measures of a successful Pesi-Cola franchise holder is the per capita consumption within its franchise territory. By this standard petitioner ranked first in the State of Kansas and in the top 5 percent of the approximately 500 Pepsi-Cola bottling plants in the United States.

Petitioner has never paid a dividend.

The parties have presented as a joint exhibit, and both seem to rely upon, the Fourth Financial Survey of the Soft Drink Industry published in 1969 by the National Soft Drink Association of Washington, D.C. This survey was conducted and compiled by Arthur Young & Co. during 1968 and also includes certain data from previous surveys conducted in 1962, 1964, and 1966. Because of the disparity of the sizes of reporting companies, compilations and specific items are all expressed as percentages of net sales. The survey reports 1968 data from all reporting companies (92); reports 1968 data for companies with gross sales of from $1 to $2 million [1] (25 companies); and reports 1968 data for companies located in the west-central geographic region (region No. 4) which includes Iowa, Kansas, Minnesota, Missouri, Nebraska, North Dakota, and South Dakota (14 companies).

We make the following findings of fact based upon such survey, and from evidence of record regarding petitioner for 1968:

| | All reporting companies (92) | Companies with $1 to $2 million sales (25 companies) | Geographic region 4 (14 companies) | Petitioner |
|---|---|---|---|---|
| Net operating income [1] | 7.67% | 7.84% | 8.89% | 7.58% |
| Salaries [1] of owners, partners, and executive officers (number not specified except one as regards petitioner) | 3.10% | [2] 2.82% | 3.97% | [3] 3.40% |
| Total number of employees | 83 | 60 | 42 | [4] 56 |

[1] Expressed as a percentage of net sales.
[2] This figure is expressed for various sized companies as follows:

| Companies with gross sales of | Executive officers' salaries |
|---|---|
| Under $½ million (12 companies reporting) | 4.8% |
| $½ million to $1 million (21 companies reporting) | 3.99% |
| $1 million to $2 million (25 companies reporting) | 2.82% |
| $2 million to $5 million (25 companies reporting) | 2.46% |
| Over $5 million (9 companies reporting) | 1.26% |

[3] Petitioner's figure for 1969 is 4 percent and its figure for 1970 is 4.1 percent.
[4] This figure was 60 for 1969 and 64 for 1970.

Line 2 of the above table shows that the salaries of owners, partners, and executive officers of all reporting companies (92) expressed as percentage of net sales for 1968 was 3.1 percent. This same figure was 3.5 percent for 1966, 3.9 percent for 1964, and 4.6 percent for 1962.

[1] Petitioner's gross and net sales for 1968, 1969, and 1970 were (rounded) $1.9 million, $2.2 million, and $2.3 million.

OPINION

Respondent's determination has disallowed all of petitioner's "salary" payments to Verla for the years in issue which were in excess of $40,000 per year as excessive and unreasonable within the ambit of section 162 of the Internal Revenue Code of 1954. The basic question therefore is whether the amounts paid to Verla as salary and bonuses constituted "reasonable allowance * * * for personal services actually rendered."

Whether amounts paid employees represent reasonable compensation for services rendered is a question of fact to be determined on the basis of the particular circumstances in each case. *Huckins Tool & Die, Inc.* v. *Commissioner*, 289 F. 2d 549 (C.A. 7, 1961), affirming a Memorandum Opinion of this Court; *Long Island Drug Co.* v. *Commissioner*, 111 F. 2d 593 (C.A. 2, 1940), affirming 35 B.T.A. 328 (1937), certiorari denied 311 U.S. 680 (1940); *Geiger & Peters, Inc.*, 27 T.C. 911 (1957); *Salem Packing Co.*, 56 T.C. 131 (1971); *Dielectric Materials Co.*, 57 T.C. 587 (1972).

The instant case does not require extended discussion of the particular facts in the above cases or in the many other cases on this subject; each of them, and the instant case, turn on their own facts. However, certain factors for consideration are repeated over and over in the cases. The weight to be accorded each of such factors of course does vary with the circumstances of the other factors there present and no one factor is conclusive.

A rather comprehensive listing of pertinent factors for consideration is found in *Mayson Mfg. Co.* v. *Commissioner*, 178 F. 2d 115, 119 (C.A. 6, 1949). This case reversed a Memorandum Opinion of this Court, but the factors for consideration there listed have been reviewed and adopted by this Court on countless occasions. The factors are listed in the following language:

Although every case of this kind must stand upon its own facts and circumstances, it is well settled that several basic factors should be considered by the Court in reaching its decision in any particular case. Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. The action of the Board of Directors of a corporation in voting salaries for any given period is entitled to the presumption that such salaries are reasonable and proper. Ox Fibre Brush Co. v. Blair, 4 Cir., 32 F.2d 42, 45, 68 A.L.R. 696; Toledo Grain & Milling Co. v. Commissioner, 6 Cir., 62 F.2d 171, 172; Capitol-Barg Dry Cleaning Co. v. Commissioner, 6 Cir., 131

F.2d 712, 715. The situation must be considered as a whole with no single factor decisive.

Respondent's determination is presumed to be correct and petitioner has the burden to prove otherwise. Rule 142, Tax Court Rules of Practice and Procedure; *Botany Mills* v. *United States*, 278 U.S. 282 (1929). If petitioner has succeeded in showing that respondent's determination was erroneous the presumption loses its effect and the Court must determine from the entire record what was reasonable compensation under the particular facts and circumstances presented in the given case.

We observe at the outset that petitioner did not call Verla as a witness, and when she was so called by respondent to confirm that she had at all times owned all but two of petitioner's 250 outstanding shares and that petitioner had never paid a dividend; that petitioner's counsel asked only three questions. He asked her age, whether she had been in good health during the years in issue, and whether she had been active on the job at all times. As a consequence of this rather unusual trial procedure there are many dark areas regarding the minutia of Verla's daily on-the-job activities, executive decision making, qualities of leadership, and other factors which might have illuminated some of the reasons for petitioner's rather spectacular growth immediately preceding and during the years in issue.

We have done our best with the record that has been made and conclude that petitioner has shown respondent's determination to be erroneous and yet we do not agree that Verla's compensation during the years in issue was a reasonable allowance for personal services actually rendered within the meaning of section 162, *supra*. The factors we have considered include the following, *inter alia*.

The resolution under which Verla was compensated was adopted 12 years before the first taxable year in issue and remained unchanged throughout the entire period and through the last year in issue. This overcomes the often expressed idea that a closely held corporation has delayed the setting of its principal owner's compensation until the results of the taxable period were known so that the maximum "salary" deduction could be taken, thus leaving less to be paid as nondeductible dividends. *Dielectric Materials Co.*, *supra*, and cases there cited.

But there is a commonsense answer to this argument which we believe has some validity in the instant case. Where the controlling resolution has remained unchanged for a long period of time it may no longer be realistic and reasonable in light of other factors regarding the employer's business which have also changed.

Section 1.162–7(b)(2), Income Tax Regs., provides that the form or method of fixing compensation is not decisive as to deductibility;

that any form of contingent compensation invites scrutiny; but that, generally speaking, if contingent compensation is paid pursuant to a *free bargain* made before the services are rendered it should be held valid.

We are dealing with contingent compensation in the instant case. Such compensation was considered by *Hammond Lead Products, Inc.* v. *Commissioner*, 425 F. 2d 31 (C.A. 7, 1970) (affirming a Memorandum Opinion of this Court, T.C. Memo. 1969–14). In that case the formula for compensation had been adopted in 1931 and the years at issue were 1963, 1964, and 1965; other relevant factors had changed in the meantime and it was held that the compensation therefore had not been fixed "pursuant to a free bargain."

In the instant case petitioner's sales had grown from a little over $1/2 million to about $2 million, its taxable income from about $40,000 to almost $200,000 and its stockholder's equity from $66,000 to about $3/4 million (the ending figures above, in each case, being a rough average of the 3 years in issue). We hold that the mechanical formula adopted in 1956 had become unrealistic on the high side by the years in issue.

This conclusion is supported by the fact that Verla was petitioner's sole executive officer throughout the entire period of petitioner's growth (1956 through 1970). Whereas some of the 92 reporting companies on the Fourth Financial Survey of the Soft Drink Industry had more than one executive officer and we conclude, absent any showing to the contrary, that this number was increased as to the larger companies surveyed. This circumstance forces a comparison of one "salary" (Verla's) with multiple "salaries" paid by comparative companies; which forces, in turn, the obvious conclusion that Verla was overcompensated.

We observe further that the percentage of Verla's bonus increased as petitioner's net income increased (from 10 percent on the first $10,000 up to 30 percent on all net income in excess of $20,000). An examination of the aforesaid financial survey shows that the smaller companies paid a higher percentage of gross sales to executive officers and that this percentage decreased markedly as the gross sales increased. These figures are 4.8 percent for companies with under $1/2 million in gross sales, decreasing down to 1.26 percent for companies with over $5 million of gross sales. The inescapable conclusion is that the larger companies were able to, and did, compensate their executive officers at a lesser percentage on their net sales than did the smaller companies even though the larger companies must necessarily have employed a greater number of executive officers.

Petitioner, with only one executive officer, was paying Verla a higher percentage of net sales (3.4 percent) in 1968 than the 25 reporting

companies with $1 million to $2 million in sales were paying their executive officers (2.82 percent) and petitioner's percentage figure *increased* to 4 percent for 1969 and 4.1 percent for 1970. All reporting companies had shown percentage compensation to executive officers' figures of 4.6 percent for 1962, 3.9 percent for 1964, 3.5 percent for 1966, and 3.1 percent for 1968, thus demonstrating a decreasing percentage figure for executive officers, directly contrary to petitioner's increasing pattern and, absent proof to the contrary, we assume that this decreasing pattern with the passage of time continued.

Because of all of the factors and circumstances here present, we have given the issue which is here involved a close scrutiny with the result that we agree with neither petitioner nor respondent. On the basis of the entire record we hold that $50,000 for 1968, $54,500 for 1969, and $57,500 for 1970 constituted reasonable compensation to Verla for services rendered.

*Decision will be entered under Rule 155.*