AUTOMOTIVE INVESTMENT DEVELOPMENT INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Automotive Inv. Dev. v. Commissioner
Docket No. 21219-88
United States Tax Court
T.C. Memo 1993-298; 1993 Tax Ct. Memo LEXIS 301; 66 T.C.M. (CCH) 57; July 12, 1993, Filed *301 Decision will be entered for petitioner. For petitioner: Howard M. Potts, James E. Kelley, Patrick J. Nelson. For respondent: Alan M. Jacobson. WHALEN
WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: Respondent determined a deficiency of $ 533,748.86 in petitioner's Federal income tax for 1984, and a deficiency of $ 544,056.60 in petitioner's Federal income tax for 1985. The issue for decision is whether the compensation paid to petitioner's president and sole shareholder, Mr. Larry Van Tuyl, is deductible under section 162(a)(1). All section references are to the Internal Revenue Code in effect during the years in issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The Stipulation of Facts filed by the parties and the exhibits attached thereto are incorporated herein by this reference. At the time the petition in this case was filed on its behalf, petitioner was a Kansas corporation. Its principal place of business was Shawnee Mission, Kansas. During 1984 and 1985, petitioner reported its income for Federal income tax purposes on a calendar basis. Petitioner was incorporated on December 27, 1977, by Mr. Larry Van Tuyl and Mr. *302 Larry Stambaugh. They made total initial contributions to petitioner's capital of $ 228,000. On August 19, 1982, petitioner redeemed Mr. Stambaugh's stock. Throughout the years in dispute, Mr. Van Tuyl owned all of petitioner's stock. He was president and a member of petitioner's board of directors from its formation through 1985. From the date of its incorporation, petitioner has engaged in the business of investing in and managing automotive dealerships and related entities. During 1984 and 1985, petitioner owned controlling interests in, and performed managerial and other services for the following companies: Subsidiary Percentage Dennis Chevrolet, Inc.
75%
R.Z. Sims Chevrolet, Inc.
75% (until its sale on 10/16/84) ABC Datsun, Inc.
100% Dennis Development, Inc.
100% Dennis Life Insurance, Inc.
100% Throughout this opinion, we refer to the above corporations as Dennis Chevrolet, Sims Chevrolet, ABC Datsun, Dennis Development, and Dennis Life, respectively. Petitioner has also performed managerial and other services for Van Tuyl Investments, Inc., a corporation owned by Mr. Van Tuyl (referred to herein as Van Tuyl Investments), and for Michael Cadillac, *303 Inc., a corporation that Mr. Van Tuyl acquired in September of 1985 (referred to herein as Michael Cadillac). Petitioner made a dividend distribution of $ 15,240 in 1982. This is the only dividend that petitioner paid from the time of its incorporation through 1985. In all other years, petitioner's board of directors declined to declare dividends in order to retain earnings for expansion and acquisitions. Mr. Van Tuyl, petitioner's sole shareholder during its 1984 and 1985 taxable years, preferred long-term economic growth over current dividends. Dennis Chevrolet
Throughout the years in dispute, Dennis Chevrolet owned and operated an automotive dealership located in Olathe, Kansas. It sold new and used cars and trucks of the following makes during the following years: Chevrolet (1974 -- 1985), Mazda (1982 -- 1985), and Subaru (1984 -- 1985). It also sold related products and services. In 1975, Mr. Van Tuyl purchased 100 percent of the stock of Dennis Chevrolet. He later contributed the stock to petitioner as part of its initial capitalization. Between January 1981 and June 1982, petitioner sold a total of 25 percent of the Dennis Chevrolet stock to William Epperson, *304 Dennis Chevrolet's general manager. Thereafter and through 1985, petitioner owned 75 percent of Dennis Chevrolet's stock. The following tables contrast the performance of Dennis Chevrolet during 1973 and 1974 (immediately prior to its acquisition by Mr. Van Tuyl) with its performance during 1976 and 1977, the first and second full years after the acquisition and with its performance during 1984 and 1985: Year
Year
Year Year Ended Ended Ended
Ended
12/31/73
12/31/74
12/31/76 12/31/77 Sales
$ 5,530,852
$ 5,870,765
$ 13,778,365
$ 16,031,789
Gross profits
814,477
897,848
1,787,902
2,068,626
Assets
979,819
1,203,183
2,141,028
2,349,468
Net income
before bonuses 88,129
89,673
737,263
732,688
New vehicle
sales (units)
620
651
1,549
1,614
Used vehicle
sales (units) 685
719
1,713
1,849
Service & body
shop average 11,588
12,167
28,970
32,392
monthly gross profit Employees
38
42
71
80
Year Year Ended
Ended
[1] % Change 12/31/84 12/31/85 [2] % Change Sales
273%
$ 42,682,188
$ 52,120,731
888%
Gross profits
230%
4,482,263
5,898,803
657%
Assets
195%
5,041,819
7,491,993
623%
Net income
before bonuses 817%
1,468,827
1,881,669
2098%
New vehicle
sales (units) 248%
2,827
3,212
493%
Used vehicle sales (units) 257%
2,292
2,752
383%
Service & body
shop average 266%
68,785
80,137
659%
monthly gross profit Employees
190%
125
132
314%
*305 Chevrolet Motor Corp. annually estimates the number of cars and trucks that it expects a particular Chevrolet dealership to sell, based on the demographics of that dealership's geographical area. These estimates are called " planning potentials". The following table sets forth the planning potentials established by Chevrolet Motor Corp. for Dennis Chevrolet for the years 1975 to 1985, and it shows Dennis Chevrolet's success at meeting those goals: Percentage
Planning
Actual
of Goal Year
Potential
Sales
Achieved
1975
760
1,133
149
1976
760
1,549
209
1977
965
1,614
167
1978
965
1,697
176
1979
965
1,376
143
1980
965
926
96
1981
1,170
848
72
1982
1,035
1,100
106
1983
1,090
1,485
136
1984
1,090
2,121
195
1985
1,085
1,936
178
When Mr. Van Tuyl acquired Dennis Chevrolet in 1975, it ranked 13th in sales, 14th in volume, and 15th in profits among the 15 Chevrolet dealers in its geographical area. Within 2 years thereafter, Dennis Chevrolet had become the top or one of the top performers in each of those categories. The compensation of the highest paid employees of Dennis Chevrolet during 1984 is as follows: Position
Compensation Used vehicle manager
$ 54,759.63
New vehicle manager
51,225.13
Lease manager
51,150.29
Finance manager
58,372.98
Parts manager
42,554.38
Controller
49,863.40
New vehicle manager (Mazda)
49,931.06
*306 The compensation for the highest paid employees of Dennis Chevrolet during 1985 is as follows: Position Compensation New vehicle manager
$ 47,338.00
Aftermarket manager
56,245.98
New vehicle manager (Mazda)
30,157.28
New vehicle manager (Subaru)
31,163.04
Used vehicle manager
46,239.98
Leasing manager
35,386.64
General sales manager
66,833.18
Finance manager
63,103.79
Finance and insurance manager
49,484.55
Controller
50,735.36
New truck manager
54,011.02
Sims Chevrolet
Sims Chevrolet owned and operated a small automobile dealership in Hutchinson, Kansas. In 1977, Mr. Van Tuyl bought 75 percent of the stock of Sims Chevrolet. Mr. R.Z. Sims owned the remaining stock. Mr. Van Tuyl contributed his stock to petitioner as part of its initial capitalization. The record contains no evidence of the sales figures of Sims Chevrolet. The dealership was apparently only marginally profitable. On October 17, 1984, petitioner sold its stock in Sims Chevrolet to an unrelated party for $ 691,582 and recognized a gain of $ 226,007. At the same time, Dennis Development sold land to Sims Chevrolet for $ 1,200,000 and recognized a gain of $ 677,629. ABC Datsun
*307 ABC Datsun owned and operated an automobile dealership in Phoenix, Arizona, that sold new and used cars and trucks, as well as related products and services. In 1982, Mr. Van Tuyl negotiated petitioner's acquisition of ABC Datsun. On September 4, 1982, petitioner acquired 100 percent of the stock of ABC Datsun, and it owned all of ABC Datsun's stock through 1985. Datsun Motor Corp. of America (Datsun), like Chevrolet Motor Corp., annually established planning potentials for its dealerships. The following table sets forth the planning potentials that Datsun established for ABC Datsun for 1983, 1984, and 1985, and it shows ABC Datsun's success in meeting those goals. The table also shows the percentage of planning potentials achieved by other Datsun dealerships on a regional and nationwide basis. Dealer
Region
National
Planning
Actual
Dealer
Average
Average
Year
Potential
Sales
Percent
Percent
Percent
1983
1700
2638
155%
75%
75%
1984
1700
4907
288%
96%
79%
1985
1700
6648
391%
129%
95%
The following table contrasts the performance of ABC Datsun during its fiscal years ending June 30, 1981, and June 30, 1982, (just prior to its acquisition by petitioner) *308 with its performance during the years ending December 31, 1983, 1984, and 1985: Year Ended
Year Ended Year Ended 6/30/81 6/30/82
12/31/83
Sales
$ 16,009,031 $ 13,013,423
$ 39,439,521
Gross profit
1,858,280 1,627,971
4,739,721
Assets
2,342,051 1,983,132
3,634,204
Net income before bonuses
(129,240)
30,204
1,954,408
New vehicle sales (units)
1,595 1,102
2,680
Used vehicle sales (units
27 46
1,333
Service & body shop average
44,431 41,303
78,655
monthly gross profit Employees 56
56
105
Year Ended Year Ended
12/31/84 12/31/85
[1] % Change Sales
$ 75,246,265
$ 89,205,289
685%
Gross profit
10,585,264
13,224,987
812%
Assets
7,687,058
10,244,346
517%
Net income before bonuses
4,233,027
5,901,907
19,540%
New vehicle sales (units)
4,984
6,686
607%
Used vehicle sales (units
2,337
2,643
5,746%
Service & body shop average
124,412
201,432
488%
monthly gross profit Employees
170
250
446%
Under Mr. Van Tuyl's management, ABC Datsun became the top Datsun dealership in the nation during 1984 and 1985. In 1985, only three other single *309 line dealerships in the country sold more cars than ABC Datsun. ABC Datsun was such a success that in 1984 or 1985 Nissan Motors (the Japanese parent company of Datsun of America) invited Mr. Van Tuyl to Japan to discuss marketing opportunities and other matters with Nissan's Japanese management. The compensation of the highest paid employees of ABC Datsun during 1984 is as follows: Position
Compensation
General manager
$ 239,962.05
General sales manager
104,372.30
Controller
48,273.26
New vehicle sales manager
124,904.41
Used vehicle sales manager
120,655.60
Used vehicle assistant sales manager
86,237.55
New vehicle assistant sales manager
91,397.95
Assistant used vehicle sales manager
92,397.95
Used vehicle sales manager
62,855.91
Assistant used cars sales manager
50,034.90
Finance manager -- NC sales manager
91,812.25
Fixed operations manager
53,223.06
The compensation of the highest paid employees of ABC during 1985 is as follows: Position
Compensation
General manager (Mel Eaton)
$ 196,686.12
General manager (Julian Graham)
146,907.45
General sales manager
164,704.42
Controller
38,171.69
NC sales manager
106,407.05
Assistant new vehicle sales manager
(Ralph Coleman)  63,630.47
Assistant new vehicle sales manager
96,982.05
Used vehicle sales manager
141,356.41
Assistant new vehicle sales manager
(David Arnold)  107,003.05
Assistant used vehicle sales manager
88,926.88
Finance manager (Woody Cullup)
66,446.80
Finance manager (Robert Finelson)
67,508.94
Fixed operations manager
60,815.92
*310 Other Related Entities
Dennis Development was in the business of holding title to and leasing realty and personalty. From August 1982 throughout the years in dispute, petitioner owned 100 percent of the stock of Dennis Development. Prior thereto, Dennis Chevrolet owned all of the stock of Dennis Development. During the years in dispute, Dennis Development acquired and leased real estate to Canyon Mazda, Inc. (Canyon Mazda), a subsidiary of Van Tuyl Investments. Also during 1985, Dennis Development leased substantial fixed assets to Michael Cadillac. We note that petitioner's 1984 consolidated Federal income tax return reports "Equipment Lease Income" of $ 56,491.48, and "Rental Income" of $ 79,800. Its 1985 consolidated return reports "Equipment Lease Income" of $ 500,099.68. Michael Cadillac owned and operated an automobile dealership located in Fresno, California, from September 3, 1985, through December 31, 1985. Mr. Van Tuyl owned 85 percent of the stock of Michael Cadillac during that period. Michael Rosvold, Michael Cadillac's general manager, owned 15 percent of the outstanding stock during the same period. Dennis Life sold credit life insurance to various *311 automotive dealerships. Petitioner formed Dennis Life on July 17, 1978, and owned 100 percent of its stock throughout the years in dispute. Dennis Life was not part of petitioner's affiliated group for purposes of petitioner's consolidated returns. Van Tuyl Investments, through its wholly owned subsidiary, Canyon Leasing, Inc. (Canyon Leasing), owned and operated an automobile dealership, Canyon Mazda, in Phoenix, Arizona, from December 17, 1984, through the end of 1985. Mr. Van Tuyl owned 100 percent of the stock of Van Tuyl Investments from June 1, 1984, through December 31, 1985. Management Agreements
Petitioner entered into management agreements with ABC Datsun, Dennis Chevrolet, and Sims Chevrolet (the managed dealerships). Under each of those agreements, petitioner bound itself to provide the services of its officers to the dealership. It also specifically contracted to provide legal, accounting, auditing, and tax preparation services, as well as consulting on other financial, operating, and management matters. Petitioner entered into separate management agreements with Van Tuyl Investments and Michael Cadillac, but the record does not reveal the terms of those *312 agreements. Mr. Larry Van Tuyl
Mr. Larry Van Tuyl grew up in the automobile business. Prior to college, he spent substantial time working in the dealerships owned by his father, a successful Kansas City auto dealer. During college, he earned money buying and selling used cars. After leaving college, Mr. Van Tuyl worked in his father's auto dealerships. He began in new car sales, and his success led to his promotion to general sales manager of a new Mazda franchise in the Kansas City area. Mr. Van Tuyl later moved on to help establish another large dealership. In 1975, he acquired Dennis Chevrolet. In 1978, Mr. Van Tuyl founded and began to work for petitioner. He supervised its operations through 1985. From August 19, 1982, through 1985, Mr. Van Tuyl was the sole shareholder of petitioner. Mr. Van Tuyl performed the following duties under petitioner's management contracts with the managed dealerships: (1) Recruiting, hiring, training, supervising, and motivating personnel; (2) overseeing studies of consumer buying trends and developing appropriate sales and business plans; (3) developing and monitoring merchandising systems; (4) coordinating customer satisfaction *313 and public relations programs; (5) negotiating and maintaining relations with automotive manufacturers and other suppliers; (6) investigating and negotiating property and equipment acquisitions; (7) negotiating and maintaining banking relationships; (8) developing advertising policies and generating advertising ideas; (9) establishing and monitoring compensation plans, policies, and procedures, and benefit programs; (10) supervising the design and construction of new automobile facilities; and (11) participating in the day-to-day operations of the dealerships. Mr. Van Tuyl was instrumental in establishing the Phoenix Datsun dealers association and strengthening the Kansas City Chevrolet dealers association. These trade groups focused on pooling advertising dollars to make a greater impact on the market. During the years in issue, Mr. Van Tuyl typically worked 70 to 80 hours per week with only 4 to 5 days of vacation per year. In 1982, Mr. Van Tuyl moved his family to Phoenix, Arizona, and thereafter he spent approximately 80 percent of his work time tending to the affairs of ABC Datsun. Mr. Van Tuyl spent 5 percent to 10 percent of his time handling Dennis Chevrolet business. *314 During 1984 and 1985, he usually visited Dennis Chevrolet 2 or 3 times a month and spent 1 to 3 days there during each visit. During the balance of the month, he stayed in contact with Dennis Chevrolet by phone, fax, and written reports. During his trips to Dennis Chevrolet in 1985, Mr. Van Tuyl spent a portion of his time managing the affairs of Dennis Nissan, a separate dealership that he had established with Mr. Epperson in June 1985. During 1984, Mr. Van Tuyl spent approximately 5 percent of his time working on Sims Chevrolet affairs. As mentioned above, petitioner sold Sims Chevrolet in October 1984. During 1984, Mr. Van Tuyl spent fewer than 10 hours of the entire year performing services on behalf of Van Tuyl Investments. In 1985, he spent 3 percent to 5 percent of his time managing the affairs of Van Tuyl Investments. After September 3, 1985, Mr. Van Tuyl worked approximately 5 to 6 hours a week assisting Michael Cadillac, and he occasionally traveled to Fresno, California, in relation to that business. Although 1984 and 1985 were relatively good years for automobile dealerships in general, the performances of Dennis Chevrolet and ABC Datsun were outstanding. Based *315 upon petitioner's financial statements for the close of the years 1978 through 1985, together with the separate financial statements of Dennis Chevrolet, the aggregate retained earnings and shareholder equity of petitioner and Dennis Chevrolet were as follows: Percentage
Percentage
Change in
Year End
Change in
Retained
Retained
Shareholder Shareholder
Year
Earnings
Earnings
[1] Equity  Equity 1978
$ 1,317,857
N/A
$ 1,545,857
N/A
1979
1,474,336
12%
1,702,336
10%
1980
1,295,923
-12%
1,523,923
-10%
1981
1,513,634
17%
1,741,634
14%
1982
1,649,888
9%
1,845,488
6%
1983
2,849,045
73%
3,044,645
65%
1984
5,291,733
86%
5,487,333
80%
1985
7,777,479
47%
7,973,799
45%
From 1978 through 1985, the aggregate sales, net income before taxes, net income after taxes, and return on shareholder equity of petitioner and Dennis Chevrolet were as follows: Net Income
Net Income
Beginning
Return on
of Year
Before After Shareholder
Shareholder
Year
Sales
Taxes Taxes Equity [1] Equity 1978
$ 19,986,064 $ 612,759   $ 340,002   --    N/A
1979
17,315,314
266,859 156,483 $ 1,545,857
10%
1980
13,927,315
(178,417)
(178,417)
1,702,336
-10%
1981
17,399,371
145,422 104,735 1,523,923
7%
1982
30,874,169
453,529 309,473 1,741,634
18%
1983
72,354,804
2,268,303 1,270,328 1,845,488
69%
1984
118,043,035
4,596,563 2,592,685 3,044,645
85%
1985
141,326,024
4,977,120 2,635,748 5,487,333
48%
*316 At the close of years 1978 through 1985, the aggregate book values of the inventories, land, depreciable property, and total assets of petitioner and Dennis Chevrolet were as follows: Depreciable Total
Year
Inventories Land Property
Assets 1978
$ 1,788,151 $ 581,488 $ 944,751  $ 4,858,335 1979
2,052,970
581,488
1,032,434
5,539,712
1980
1,422,576
659,509
1,143,693
5,129,568
1981
1,768,873
581,488
1,116,348
5,567,454
1982
4,558,815
581,488
1,331,883
9,408,188
1983
5,768,302
581,488
1,544,989
12,451,084
1984
9,670,278
491,425
1,315,858
15,464,920
1985
12,470,973
1,893,973
3,265,560
22,642,060
The credit for the success of Dennis Chevrolet and ABC Datsun must be given to Mr. Van Tuyl, who, in each case, took over a troubled or marginal business and transformed it into a success. Mr. Van Tuyl was able to read market trends and was able to shape sales programs to capitalize on the trends that he accurately anticipated. In addition, he developed training and motivational techniques that improved the sales performance of the managed dealerships. Mr. Van Tuyl expanded the profit base of each dealership by emphasizing previously *317 neglected areas such as used vehicle sales, the parts department, financing and insurance contracts, warranty contracts, body shop, and repair services. Further, Mr. Van Tuyl's business acumen improved the dealerships' negotiating positions with manufacturers and its relations with its bankers. Mr. Van Tuyl's outstanding management abilities led various automobile manufacturers to request that he open new franchises to market their products or that he take over established dealerships that were performing poorly. Mr. Van Tuyl's Employment Contract
On August 19, 1982, Mr. Van Tuyl and petitioner entered into an employment agreement. As both the sole shareholder of petitioner and the affected employee, Mr. Van Tuyl was in complete control of the terms of the contract. Under the agreement: Larry Van Tuyl shall be generally responsible for assisting in the administration, supervision, and operation of any and all motor vehicle dealerships which AID [i.e., petitioner] may have management agreements with from time to time. Larry Van Tuyl shall assist in programs relating to the sale and leasing of automobiles and trucks, customer contracts, warranty administration, all *318 subordinate personnel matters, the proper functioning of the service department and maintenance of the parts sales and inventory. To that regard, Larry Van Tuyl shall contribute his best management and consulting skill and service for the business and benefit of all clients. Additionally, Larry Van Tuyl shall assist by analyzing the financial reports, books and records of all clients and offer direction based upon his findings.
Although the employment agreement appears to require that Mr. Van Tuyl provide services to all of petitioner's clients, the attachments to the agreement, which detail the compensation to be paid, provide for compensation under the agreement based only on the services provided by Mr. Van Tuyl to ABC Datsun, Dennis Chevrolet, and Sims Chevrolet. There is no indication that Mr. Van Tuyl contracted to receive any compensation, or did in fact receive any compensation, for his work on behalf of petitioner's two other subsidiaries, Dennis Development and Dennis Life. Mr. Van Tuyl was paid for the services that he rendered to Van Tuyl Investments and Michael Cadillac through separate compensation agreements. The compensation at issue in this case derives solely *319 from Mr. Van Tuyl's performance of services on behalf of ABC Datsun, Dennis Chevrolet, and Sims Chevrolet. From 1979 through mid-1982, petitioner's board of directors (the board) set Mr. Van Tuyl's compensation by resolution. Thereafter, his compensation was determined by the terms of his employment agreement with petitioner. Under both the board resolutions and the employment agreement, Mr. Van Tuyl was paid a base salary and monthly and annual bonuses. All bonuses paid to Mr. Van Tuyl were computed on the basis of the pretax profits or losses of Sims Chevrolet, Dennis Chevrolet, and ABC Datsun. That is, Mr. Van Tuyl's compensation would be increased by a percentage of the pretax profits earned by one of the managed dealerships, but it would be decreased by a percentage of the pretax losses sustained by one of the dealerships. From 1978 through 1980, Mr. Van Tuyl's compensation consisted of a monthly salary of $ 3,600, and a combination of monthly and annual bonuses amounting to 14.5 percent and 19 percent of the annual profits or losses of Sims Chevrolet and Dennis Chevrolet, respectively. In late 1980, effective for 1981, petitioner's board increased Mr. Van Tuyl's bonus *320 with respect to the profits or losses of Dennis Chevrolet to 28 percent. As of August 19, 1982, as a result of petitioner's acquisition of ABC Datsun, the board increased Mr. Van Tuyl's base salary from $ 3,600 to $ 8,600 per month and resolved to pay him a bonus of 28 percent of ABC Datsun's profits or losses. In 1984, petitioner paid Mr. Van Tuyl a base salary of $ 8,600 per month for the first 7 months, and $ 7,100 per month for the last 5 months. The decrease in base salary was due to the sale of Sims Chevrolet in October 1984. Mr. Van Tuyl's employment contract continued to require petitioner to pay the same bonuses with respect to the profits or losses of Sims Chevrolet, Dennis Chevrolet, and ABC Datsun (i.e., 14.5 percent, 28 percent, and 28 percent, respectively). It is unclear whether petitioner paid any bonus to Mr. Van Tuyl in 1984 with respect to Sims Chevrolet. In 1985, petitioner paid to Mr. Van Tuyl a base salary of $ 7,100 per month and a bonus of 28 percent of the profits or losses of Dennis Chevrolet and ABC Datsun. Petitioner paid the following compensation to Mr. Van Tuyl during the years 1978 through 1985: Year
Salary
Bonus Total 1978
$ 43,200 $ 222,995  $ 266,195  1979
43,200
220,646
263,846
1980
43,200
25,924
69,124
1981
43,200
40,674
83,874
1982
63,200
357,922
421,122
1983
103,200
1,059,039
1,162,239
1984
95,700
1,572,624
1,668,324
1985
85,200
1,969,531
2,054,731
*321 During the above period, petitioner did not provide stock options, a pension plan, or any other deferred compensation to Mr. Van Tuyl. Compensation of Petitioner's Other Officers
From January 1, 1978, through August 18, 1982, Mr. Larry Stambaugh owned 5 percent of petitioner's stock, and he was petitioner's Secretary-Treasurer. Mr. Stambaugh was actively involved in the management of the related dealerships. His compensation for each of the years of his employment was $ 1,900 per month plus 3 percent of the pretax profit or loss of Dennis Chevrolet and Sims Chevrolet. The board awarded Mr. Stambaugh additional bonuses of $ 31,200 in 1980, $ 57,200 in 1981, and $ 23,878.90 in 1982. From August 18, 1982, through 1985, Ms. Nona P. Martin was petitioner's secretary, and Mr. Lloyd E. Stewart was petitioner's treasurer. Neither of them received any compensation. The record reveals no information regarding any services that either Ms. Martin or Mr. Stewart provided to petitioner or to the managed dealerships. Industry Practice and Usage
Generally, the automotive sales industry is incentive oriented. A large part of the compensation of most employees at a dealership *322 consists of commissions and other incentive-based compensation. All of the key employees at the managed dealerships were compensated according to formula pay plans. In the automobile industry, bonus arrangements for dealership operators range from 20 percent to 33.33 percent of pretax net profits. These bonus percentages generally do not vary in response to the size or success of the dealership, nor do they depend on whether the operator owns a controlling interest in the dealership. Mr. Van Tuyl was well aware of this industry practice and took it into account when he developed the compensation formula prescribed by his 1982 employment agreement with petitioner. Mr. Van Tuyl also took into account the value of his services to petitioner and the effect that the compensation formula would have on the reasonableness of the return on his investment in petitioner. OPINION Petitioner deducted the compensation paid to Mr. Van Tuyl in the amounts of $ 1,668,324 in 1984 and $ 2,054,731 in 1985. Respondent determined that the maximum reasonable compensation is $ 508,000 in 1984 and $ 872,000 in 1985 and disallowed the deductions for Mr. Van Tuyl's compensation in excess of those amounts. *323 Based upon these adjustments, respondent determined deficiencies of $ 533,748.86 for 1984 and of $ 544,056.60 for 1985. Petitioner bears the burden of proving that respondent's determination is erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure. In this case, petitioner bears the burden of proving the reasonableness of the compensation. E.g., Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1155 (1980) (citing Botany Worsted Mills v. United States, 278 U.S. 282 (1929)). Section 162(a)(1) allows a deduction for ordinary and necessary business expenses including "a reasonable allowance for salaries or other compensation for personal services actually rendered". Thus, there is a 2-prong test for deductibility under section 162(a)(1): (1) The amount of the compensation must be reasonable, and (2) the payments must in fact be purely for services rendered. Sec. 1.162-7(a), Income Tax Regs. Typically, courts focus on the first prong of the test because proof of the second prong, which requires a finding of "compensatory purpose", can be difficult to assess due to its subjective nature, and because *324 "The existence of a compensatory purpose can often be inferred if the amount of the compensation is determined to be reasonable". Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282. The reasonableness of compensation is a question of fact to be determined from all of the facts and circumstances. Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 151 (8th Cir. 1974), affg. T.C. Memo. 1973-130; Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992). The factors employed by courts in determining the reasonableness of compensation can be consolidated into the following five categories: (1) The employee's qualifications and role in the company including factors such as the employee's position, hours worked, duties performed, and his or her overall contribution to the success of the company; (2) the character and condition of the company, including factors such as the size of the company, the complexity of its *325 business, and the general economic conditions; (3) a comparison of the employee's compensation with the compensation paid by similar companies for comparable services; (4) the salary policy of the company for all its employees and the particular employee's salary history with the company; (5) the likelihood that a hypothetical, independent investor would be willing to compensate the employee at the levels paid by the company, taking account of dividends paid and capital growth. See Elliotts, Inc. v. Commissioner, supra at 1245-1248; Charles Schneider & Co. v. Commissioner, supra at 152; Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949) revg. and remanding a Memorandum Opinion of this Court dated November 16, 1948. No single factor is determinative. See Estate of Wallace v. Commissioner, supra at 553. Our conclusion in this case is the result of evaluating all of the facts of the case. Employee's Role in the Company
Many factors are relevant in assessing an employee's role in a company. The employee's irreplaceability *326 and his or her responsibility for the success of the venture are central. See Home Interiors & Gifts, Inc. v. Commissioner, supra at 1158. The nature, extent, and scope of the employee's work are also of great weight. Pepsi-Cola Bottling Co. v. Commissioner, 528 F.2d 176, 179 (10th Cir. 1975), affg. 61 T.C. 564 (1974). In addition to the fact that Mr. Van Tuyl is a highly motivated and extremely productive businessman, the record shows that he has unique characteristics that make him irreplaceable to petitioner and largely responsible for its success. The record shows that Mr. Van Tuyl had an extraordinary aptitude for automotive sales and that his dealerships succeeded far beyond comparable enterprises. He was able to make winners out of both losers and marginal players. He transformed Dennis Chevrolet, which had been at or near the bottom of its market, into a regional success. He turned ABC Datsun, which had been only marginally profitable, into the number one Datsun dealership in the nation. His spectacular success led manufacturers to seek him out and to solicit his involvement *327 in their merchandising chains. Furthermore, Mr. Van Tuyl's duties included responsibility for petitioner's entire operation and that of its related dealerships. He took responsibility for personnel matters, sales, service, dealing with manufacturers, dealing with banks, etc. These responsibilities required Mr. Van Tuyl to work 70 to 80 hours per week to ensure that all parts of the sales and service programs of the managed dealerships were operating at optimum levels. Character and Condition of the Company
The growth, profitability, and financial condition of the company are important factors in determining the reasonableness of compensation. Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. at 1157-1158; Skyland Oldsmobile, Inc. v. Commissioner, T.C. Memo. 1972-17. In evaluating those factors, it is helpful to compare the taxpayer's sales, net income, growth, and market share to those of similar enterprises. See Home Interiors & Gifts, Inc. v. Commissioner, supra at 1146-1149. Also relevant are the complexity of the business environment and the general condition of *328 the economy. See Pepsi-Cola Bottling Co. v. Commissioner, supra at 179; Skyland Oldsmobile, Inc. v. Commissioner, supra.In automotive dealership cases, this Court has examined planning potential data to help quantify the relative success of an enterprise in its market. See, e.g., Good Chevrolet v. Commissioner, T.C. Memo. 1977-291; Van's Chevrolet, Inc. v. Commissioner, T.C. Memo. 1967-172. By any measure, the performance of Dennis Chevrolet and ABC Datsun under the direction of Mr. Van Tuyl was striking. Between 1982 and 1985, gross sales rose over 350 percent, from $ 30,874,169 to $ 141,326,024. Net income after taxes increased more than 750 percent, from $ 309,473 to $ 2,635,748. Total assets increased over 140 percent, from $ 9,408,188 to $ 22,642,060. Retained earnings rose more than 370 percent, from $ 1,649,888 to $ 7,777,479. The performance of Dennis Chevrolet far surpassed the market average. Between 1978 and 1985, the number of Chevrolets sold nationally dropped 69 percent. However, Dennis Chevrolet's sales increased 14 percent during *329 that same period. In addition, Dennis Chevrolet met its planning potentials in 6 out of 8 years. It achieved 178 percent of its planning potential in 1985 and 195 percent of its planning potential in 1984. ABC Datsun's performance was even more impressive relative to the market. It achieved 288 percent of its planning potential in 1984, when the average Datsun dealer in America met only 79 percent of its planning potential. In 1985, ABC Datsun achieved 391 percent of its planning potential, while all dealers averaged 95-percent success. Compensation for Comparable Positions
The regulations promulgated under section 162(a)(1) direct a comparison of salaries paid by similar businesses to similar employees under similar circumstances. The regulations state: It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. * * * [Sec. 1.162-7(b)(3), Income Tax Regs.]
However, section 162 is "not designed to regulate businesses by denying them a deduction for the payment of compensation in excess of the norm" in cases where other factors call for *330 higher compensation. Home Interiors & Gifts, Inc. v. Commissioner, supra at 1162; see also Diverse Industries, Inc. v. Commissioner, T.C. Memo. 1986-84. Petitioner contends that the amount of Mr. Van Tuyl's compensation is justified by the scope of his work and his outstanding performance. Petitioner argues that Mr. Van Tuyl's salary was established on the basis of a formula that is commonly used in the automotive sales industry. Petitioner maintains that its contention of reasonableness is supported by the fact that Mr. Van Tuyl's compensation for 1984 and 1985 was set in accord with a formula that had remained constant since petitioner acquired ABC Datsun in 1982 and had remained substantially the same since 1978. Respondent asserts that Mr. Van Tuyl's compensation far exceeded what would be paid to a comparable employee in a comparable company. Respondent contends that although the formula compensation percentage used by petitioner might be reasonable and appropriate in a smaller company with lower net profits, in this case, the dollar amount of the compensation derived from the formula was unreasonable. Both *331 petitioner and respondent introduced expert testimony at trial to evaluate the reasonableness of Mr. Van Tuyl's compensation. Petitioner's first of two experts was Mr. Carl Woodward, a certified public accountant with 15 years' experience specializing in the operation of automobile dealerships. Mr. Woodward's testimony went to the custom and practice in the automobile sales industry regarding executive compensation during the years in question. During those years, Mr. Woodward provided services to approximately 75 automobile dealership clients. Mr. Woodward testified that during 1984 and 1985 it was standard for automobile dealerships to pay their operators a moderate base salary supplemented by a bonus ranging from 20 percent to 33.3 percent of pretax profits or losses. Mr. Woodward further testified that those percentages did not vary either based on whether the operator also owned the dealership or based on the success of the dealership. Petitioner's second expert was Mr. Roderick Duff of the Hay Group, a nationally-known compensation consulting organization. Mr. Duff valued Mr. Van Tuyl's services under the "Hay System". Mr. Duff evaluated Mr. Van Tuyl's services in terms *332 of three characteristics needed for job performance: "Know how", "problem solving", and "accountability". Mr. Duff then assigned points to each category of characteristics based on the demands of Mr. Van Tuyl's job. He fed that data into a model to predict what an individual performing a job of the same importance with the same amount of tenure and level of performance would be paid. Mr. Duff came to the conclusion that Mr. Van Tuyl's salary for each year was reasonable. Significantly, the survey data and other compensation information used to predict Mr. Van Tuyl's salary did not include data from the automotive sales industry. Respondent's expert witness was Mr. James Brennan, president of Brennan, Thomsen Associates, Inc., another compensation consulting firm. Mr. Brennan opined that the maximum reasonable salary for Mr. Tuyl was $ 496,460 in 1984 and $ 539,200 in 1985. In formulating this opinion, Mr. Brennan analyzed surveys of compensation paid to executives of similar size corporations in the following industries: Durable goods manufacturing, "the machinery group", and wholesale and retail trade. Mr. Brennan's report took no account of any data from the automotive sales *333 industry. In addition, Mr. Brennan's "maximum" reasonable compensation figures were not the highest compensation figures actually reported, but were arrived at through statistical extrapolation from the average salaries reported. We may accept or reject expert testimony, as our best judgment dictates. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Procacci v. Commissioner, 94 T.C. 397, 420 (1990); Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989). We find Mr. Woodward's testimony regarding the custom and practice in the automotive sales industry to be probative. We note that this Court has acknowledged that: In the automobile dealership business, it is customary to compensate officers and other key employees by paying them relatively modest salaries together with a bonus based on the profits of the business. [Good Chevrolet v. Commissioner, T.C. Memo. 1977-291.]
See also Superior Motors, Inc. v. Commissioner, T.C. Memo. 1974-187. Mr. Woodward's testimony shows that the compensation formula contained *334 in Mr. Van Tuyl's compensation agreement was in line with the compensation formulas used by other dealerships. We assign less weight to the testimony of Mr. Duff and Mr. Brennan. Neither of them considered actual compensation paid in the automotive sales industry, and it is not clear that the industries used in their analyses are comparable to the automotive sales industry. Therefore, their usefulness in determining the "amount as would ordinarily be paid for like services by like enterprises under like circumstances" is doubtful. Sec. 1.162-7(b)(3), Income Tax Regs.; see, e.g., Diverse Industries, Inc. v. Commissioner, T.C. Memo. 1986-84. Salary Policy of Petitioner and Employee's Salary History
The record shows that the compensation of all key employees of petitioner and its managed dealerships was determined using incentive formulas that were based on the profitability of the enterprise or of a particular department. This follows the general practice in automobile dealerships. Although Mr. Van Tuyl's compensation was greater than that of the other employees, it is clear to this Court that Mr. Van Tuyl's responsibilities were far more *335 demanding, broader in scope, and more complex than those of anyone else in petitioner's employ. Mr. Van Tuyl's salary in 1984 and 1985 was paid according to a formula that had remained constant since 1982 and substantially similar since 1978. The following table presents a comparison of Mr. Van Tuyl's salary and gross sales of the managed dealerships for 1982 through 1985: Salary as
Percentage
Year
Salary
Gross Sales
of Sales 1982
$ 421,122  $ 30,874,169  1.36%
1983
1,162,239
72,354,804
1.61%
1984
1,668,324
118,043,035
1.41%
1985
2,054,731
141,326,024
1.45%
Furthermore, as the sales of the managed dealerships increased from $ 30 million in 1982 to $ 141 million in 1985, Mr. Van Tuyl's duties and responsibilities as chief executive became more complex and demanding. The jobs of procuring and financing inventory presented an important executive function and an ongoing challenge, as the managed dealerships vied with other dealerships for larger slices of a relatively stable supply of automobiles. Independent Investor Standard
Mr. Van Tuyl was the sole shareholder of petitioner and was responsible for setting his own compensation and declaring *336 dividends. In fact, since petitioner was incorporated in 1977, it paid no dividends other than a $ 15,240 distribution made in 1982. Accordingly, we must scrutinize this case carefully to determine whether the payments to Mr. Van Tuyl are, in part, distributions of profit. Elliotts, Inc. v. Commissioner, 716 F.2d at 1246; Charles Schneider & Co. v. Commissioner, 500 F.2d at 152-153; Neils v. Commissioner, T.C. Memo. 1982-173. Under these circumstances, it is helpful to evaluate the compensation paid from the point of view of a hypothetical independent investor. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1326-1327 (5th Cir. 1987), affg. T.C. Memo. 1985-267; Elliotts, Inc. v. Commissioner, supra; at 1247; Neils v. Commissioner, supra; Townsend v. Commissioner, T.C. Memo. 1980-264. In theory, an independent investor would not approve executive compensation to the extent that the investor is deprived of a reasonable return *337 on his or her investment in an otherwise profitable enterprise. At the outset, we note that a history of paying few or no dividends by itself does not automatically lead to the conclusion that the amount of Mr. Van Tuyl's compensation was unreasonable. Owensby & Kritikos, Inc. v. Commissioner, supra at 1326; Kennedy v. Commissioner, 671 F.2d 167, 176 (6th Cir. 1982), revg. 72 T.C. 793 (1979). There may be acceptable reasons for not paying dividends, including a need for high levels of working capital or the shareholders' preference for capital appreciation. Owensby v. Kritikos, Inc. v. Commissioner, supra at 1326. In this case, without belaboring the facts, it is clear to us that a hypothetical independent investor would have been pleased with the return on equity realized by petitioner during the years in issue. In 1984, return on shareholder equity was 85 percent, as measured by net income after taxes divided by shareholder equity (capital contributions plus retained earnings). In 1985, return on shareholder equity was 48 percent, as measured by the same standard. These returns *338 provide a good indication that "management is providing compensable services and that profits are not being siphoned out of the company disguised as salary." Elliotts, Inc. v. Commissioner, supra at 1247. A final point should be addressed. We note that respondent does not contend that the use of a formula to determine the compensation of an owner-employee is unreasonable per se. Respondent's brief states as follows: Respondent does not argue that this contingent compensation arrangement is per se unreasonable. Rather, it is respondent's position that the amounts paid to Mr. Van Tuyl in 1984 and 1985 are not reasonable. Compensation payable under such contingent arrangements must meet the same requirements as other compensation, i.e., it must be reasonable in amount and be paid with regard to services rendered. * * *
We also note that this and other courts have approved as reasonable all or substantial parts of the compensation of owner-employees computed under incentive forumulas. See, e.g., Kennedy v. Commissioner, supra; Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142 (1980); *339 Pepsi-Cola Bottling Co. v. Commissioner, 61 T.C. 564 (1974), affd. 528 F.2d 176 (10th Cir. 1975); Hendricks Furniture, Inc. v. Commissioner, T.C. Memo. 1988-113; Contract Reproduction Co. v. Commissioner, T.C. Memo. 1987-476; Owensby & Kritikos, Inc. v. Commissioner, T.C. Memo. 1985-267, affd. 819 F.2d 1315 (5th Cir. 1987); Diverse Industries v. Commissioner, T.C. Memo. 1986-84; Georgia Crown Distributing Co. v. Commissioner, T.C. Memo. 1983-459; Good Chevrolet v. Commissioner, T.C. Memo. 1977-291; Osborn Motors, Inc. v. Commissioner, T.C. Memo. 1976-153; Superior Motors, Inc. v. Commissioner, T.C. Memo. 1974-187; Skyland Oldsmobile, Inc. v. Commissioner, T.C. Memo. 1972-17; Van's Chevrolet, Inc. v. Commissioner, T.C. Memo. 1967-172. Moreover, in the context of evaluating the reasonableness of *340 compensation to owner-operators of automotive dealerships, this Court has specifically stated that: the practice of giving bonuses at year's end is such a widely practiced method of compensating the dealer that this Court will inquire into only the reasonableness of the amount paid and whether it is in fact a payment for services actually rendered or is in reality a return on capital invested. [Superior Motors, Inc. v. Commissioner, supra.]
Notwithstanding the above, the fact that the compensation of an owner-employee was determined under a contingent compensation formula, adopted in good faith and reasonable when adopted, does not necessarily mean that the compensation is reasonable. Pepsi-Cola Bottling Co. v. Commissioner, 528 F.2d 176 (10th Cir. 1975) affg. 61 T.C. 564 (1974). In that case, the court stated: due to the identity between the predominant shareholder and the employee in our case we cannot accept the applicability of the "incentive compensation" reasoning. * * * A bonus contract that might be reasonable if executed with an executive who is not a controlling *341 shareholder may be viewed as unreasonable if made with a controlling shareholder, since incentive to the stockholder to call forth his best effort would not be needed. [Id. at 182.]
All of the circumstances must be considered in determining the reasonableness of the compensation. Id. In Pepsi-Cola, the executive compensation in question, as a percentage of net sales, was shown to be in excess of that paid by similar-size companies in the same industry. Pepsi-Cola Bottling Co. v. Commissioner, 61 T.C. 564, 569 (1974). In fact, the dollar amount of the compensation paid to the taxpayer's sole executive officer exceeded the compensation paid to the entire executive cadres of comparable entities. Furthermore, in Pepsi-Cola, the taxpayer had presented "little or no evidence of the nature, extent and scope" of the owner-employer's work, of the prevailing economic conditions, or of the company's salary policy regarding its other employees. Pepsi-Cola Bottling Co. v. Commissioner, 528 F.2d at 180. In the instant case, in contrast, the uncontroverted evidence shows that the *342 formula compensation paid to Mr. Van Tuyl fell well within industry norms. In addition, the record details a direct link between Mr. Van Tuyl's extensive and innovative management and the spectacular performance of the dealerships under his control. Under Mr. Van Tuyl's management, the fortunes of petitioner and the managed dealerships skyrocketed. We are especially impressed by the meteoric rise of the gross sales and net income of these enterprises as compared to the performance of their competitors. See, e.g., Kennedy v. Commissioner, 671 F.2d at 176; Home Interiors & Gifts, Inc. v. Commissioner, supra at 1162. During the years at issue, petitioner enjoyed a generous annual return on shareholder equity, and large amounts of taxable income remained in petitioner and Dennis Chevrolet after the payment of Mr. Van Tuyl's compensation. Based upon all of the facts and circumstances of this case, and given the extraordinary efforts and success of petitioner under Mr. Van Tuyl's direction, we hold that total dollar amounts that petitioner deducted in 1984 and 1985 as compensation to Mr. Van Tuyl are reasonable. In *343 reaching this conclusion, however, we point out that there may come a point at which the application of the subject formula will result in compensation that is unreasonable under section 162(a). To reflect the foregoing, Decision will be entered for petitioner. Footnotes
1. Percentage change between 12/31/74 and 12/31/77 figures.↩
2. Percentage change between 12/31/74 and 12/31/85 figures.↩
1. Percentage change between 6/30/82 and 12/31/85 figures.↩
1. In this case, "Year End Shareholder Equity" is defined as contributed capital plus retained earnings.↩
1. In this case, "Return on Shareholder Equity" is defined as net income after taxes divided by shareholder equity as of the beginning of the year.↩